(*Circuit Court of Cook County. In Chancery.*)

## The People ex rel. Maurice T. Moloney, Attorney General
### vs.
### Chicago Fair Grounds Association.

(August 14, 1895.)

1. INJUNCTION TO RESTRAIN CRIME. A court of equity has no juris-
   diction to restrain the commission of a crime, nor to enforce
   moral obligations, nor can it rightfully interfere with the per-
   formance of an illegal act, merely because it is illegal, in the
   absence of any injury to property rights.
2. INJUNCTION TO RESTRAIN NUISANCE AT SUIT OF PRIVATE INDIVIDUAL.
   Where private individuals suffer an injury quite distinct from
   that of the public in general, in consequence of a public nui-
   sance, they are entitled to an injunction and relief in equity.
3. INJUNCTION ON APPLICATION OF ATTORNEY GENERAL. The attorney
   general, on his own motion, in behalf of the state, may insti-
   tute proceedings by information in chancery to prevent ob-
   structions or to abate nuisances on the public highways, streets,
   bays or harbors, as citizens have in them a vested right of en-
   joyment and user; but the state, as father of the people, and
   guardian of public morals, cannot institute such action in the
   absence of property rights or other interests conferring juris-
   diction.
4. INJUNCTION TO RESTRAIN ULTRA VIRES CORPORATE ACTS. A corpo-
   ration can exercise only such powers and privileges as its char-
   ter confers; if it transcends its charter powers the state can
   elect to proceed at law to annul the charter or in chancery to
   enjoin it from acting *ultra vires.*
5. CHARTER A CONTRACT—PROPERTY RIGHT OF STATE THEREIN. If, as
   conceded, a charter is a contract between the state and a cor-
   poration, the former has such a property interest therein as
   will give a court of equity jurisdiction of the cause, to ascer-
   tain whether the facts charged in the information are true, and
   having acquired jurisdiction for any purpose, it may enjoin

such acts on the part of defendant as amount to infractions of the laws, although such acts may be criminal in their nature.

6. The defendant is a corporation organized under the laws of Illinois for the purpose of establishing and maintaining a driving park and race track, where running, trotting and other meetings might be held. It appeared that the defendant permitted during the races conducted by it, betting and wagering upon its premises upon the races, and licensed persons, clubs and bookmakers to engage in the business of making bets and wagers upon such races on its grounds and elsewhere. At the suit of the state by the attorney-general by information in the nature of injunction, *held* that the injunction should issue, and a motion to quash the writ issued should be denied.

For statement of facts, see opinion.

*George Hunt* and *John S. Stevens,* solicitors for complainant.

*Richard Prendergast* and *J. E. Deakin,* solicitors for defendant.

GIBBONS, J. :—

On August 14, A. D. 1895, the solicitors in behalf of the people of the state of Illinois, applied to me, in chambers, for a preliminary injunction against the Chicago Fair Grounds Association, based upon a document in the nature of an information in chancery, signed by Hon. Maurice T. Moloney, attorney general, in behalf of the people of the state of Illinois.

It is alleged in the information that the defendant is incorporated under the laws of Illinois; that its capital stock is $300,000; that the object of the corporation, as set forth in its charter is to establish and maintain a driving park and race track, where running, trotting and other meetings may be held, to develop the speed and endurance of thoroughbred horses, and to hold fairs, horse shows, fat stock exhibitions, and entertainments of all kinds at such driving park; that after its incorporation the defendant secured the control of certain lands near Harlem, in Cook county, and caused to be constructed thereon a racing track, grand stand, stables, sheds, betting booths, etc.; that all of said buildings are inclosed by a close fence which entirely surrounds the grounds of defend-

ant; that defendant offered prizes and premiums upon races, solicited entries of horses therefor, and by advertisements and otherwise invited the general public to attend the same; that, since the opening of the said grounds for the purpose of conducting racing thereon, the said corporation has permitted and allowed within its grounds, at all times during the races conducted by it, the making of bets upon the races so conducted and run by it, and has, generally, during the time of such races, further permitted the making of bets and wagers within its premises upon horse races, run at places and upon tracks other than the track of said corporation, and has licensed or otherwise knowingly and intentionally given and permitted, for a consideration, the privilege to persons and so called clubs, commonly known as book-makers, to engage in the business within its inclosure, of receiving and making bets and wagers upon such races so run upon its grounds and elsewhere; and has rented and leased to such book-makers its said booths for said privileges and purposes aforesaid, at and for the consideration of $100 a day for each of such booths; and has, by its agents and employes, engaged in the like business of book-making, and of receiving and laying bets and wagers in and upon said premises on horse races; that said corporation, its officers and agents are now engaged in said business of renting and leasing its said booths and premises for the book-making and the betting purposes aforesaid, etc., followed by the usual allegations as to nuisances, and praying for an injunction restraining defendant renting or leasing its premises for the said last mentioned purposes, and restraining defendant, its officers and agents, from the laying of bets or wagers upon horse races and the making of books, etc.

The language of the information is substantially similar to that employed by the supreme court of the state in *Swigart v. The People*, 154 Ill. 284, wherein it is held that horse racing is a game within the meaning of section 127 of the Criminal Code, and that a place under the grand stand at a driving park used for the purposes of book-making and selling pools upon races is a gaming house.

Relying upon representations made at that time by Messrs. Hunt and Stevens, solicitors for the people, I considered the emergency such as to demand immediate action, and accordingly granted the writ *ex parte,* but afterward, on application of defendant, I suspended its operation until a full hearing could be had.

On motion made by the defendant's solicitors to quash the writ, the power and jurisdiction of the court to grant an injunction, are challenged, chiefly upon the ground that chancery can interfere to prevent the commission of a criminal act or to abate a nuisance, only in a case where property rights are involved. As against this contention, it is asserted, that while it is true that a private individual can only invoke the aid of chancery where he suffers a private injury or threatened wrong to his property and he has no adequate remedy at law, a different rule applies when the state in its sovereign capacity sets in motion the machinery of the law. To ascertain and to declare the law, is the *alpha* and *omega,* the beginning and the end, of a judge's duty; and if that duty impels the quashing of the writ directed against gambling within the defendant's inclosure I shall yield obedience to the law which is as binding upon the judge as it is upon the humblest citizen of the land.

In this state, the law and its machinery are ample to punish criminals committing any kind of crime, and should they go unwhipped of justice, it is owing to the dereliction of officers of the law. It is needless to say that the apathy and indifference of a large number of those whom we are pleased to enlist among our best citizens in respect to public affairs, are largely responsible for the frequent miscarriage of justice in our larger cities.

There is not perhaps in any other state or country today, a statute which is so ample in its provisions, so lucid in its language, so severe in its penalties against gambling as the Criminal Code of Illinois. Notwithstanding these facts, the people of this city as it would seem from the arguments advanced in this cause and the appeals made to the court to afford them relief, are as hopelessly in the toils of blacklegs and

gamblers, as if the law was powerless to punish and crush them.

The law is powerful. The means and methods which it provides for the punishment of criminals are certain, swift and severe, and these agencies, I doubt not, will be effectually employed, just as soon as an enlightened and aroused public sentiment strengthens the arms of the state's attorney, whose duty and purpose it is to prompt and press the administration of the criminal law.

In order to sustain the position which I am enforced to assume in this case, it will be unnecessary to quote at length from the adjudicated cases. An examination of the principles underlying the questions involved made with that exacting care and conscientious consideration which the merits of the controversy demanded, brings a keen sense and an acute appreciation of the grave responsibilities resting upon me. A judge can have no self-tinctured policy prescribing a course of action—can entertain no purpose save such as duty dictates—can know neither fear nor favor for friend or foeman, and it is his peculiar province to deal with and determine the rights of persons and of property, his object and endeavor ever to be just and right, keeping within the sacred precincts of the law wherein there is ever punishment for wrong and protection for right.

The assumption of jurisdiction where it does not exist and the formulation of rules applicable to each particular case by a judge, would work the extinction of vested rights and the destruction of all constitutional guarantees, taking away all security for life, liberty and property under the law.

"If I were to ask you, gentlemen of the jury," said Lord Erskine in defense of Paine, "what is the choicest fruit that grows upon the tree of English liberty, you would answer, security under the law. If I were to ask the whole people of England the return they looked for at the hands of government, for the burdens under which they bend, I should still be answered, security under the law; or, in other words, an impartial administration of justice." (Libel Trial of Thomas Paine.)

It is unnecessary here to discuss questions familiar to lay-
men as well as lawyers, respecting the distribution of govern-
mental powers, and the agencies through which these powers
are to be employed and administered. Nor is it necessary to
recall the manner in which the courts were ordained and their
jurisdictions conferred, in order to show that civil courts are
for the purpose of administering civil justice between liti-
gants, as distinguished from that criminal justice which is
meted out in courts especially provided for such procedures.

The origin and the growth of jurisdiction of the chancery
court, like many other of our institutions, may be traced back
to the Romans, but the office of chancellor acquired little im-
portance in England until Matilda the First of the Plantage-
nets elevated to that position one who endowed the office with
a character and celebrity it has never lost—the celebrated and
saintly Thomas a'Becket.

From the introduction of this court in England to the pres-
ent time every attempt made by it to encroach upon the an-
cient and inalienable rights of the subject as established and
enforced in the courts in accordance with the principles of
the common law, has been resented and repelled by the Eng-
lish people and invalidated by the British Parliament.

Sir William Blackstone in his Commentaries on the Laws
of England pays this high tribute to that branch of the law
designed for the prevention of crime, "and really," he says,
"it is an honor, and almost a singular one, to our English
laws, that they furnish a title of this sort, since preventive
justice is, upon every principle of reason, of humanity and of
sound policy, preferable in all respects, to punishing justice.
This preventive justice consists in obliging those persons
whom there is a possible ground to suspect of future misbe-
havior, to stipulate with and to give full assurance to the pub-
lic, that such offense as is apprehended shall not happen; by
finding pledges or securities for keeping the peace, or for
their good behavior." 4 Black. Com. ch. 18.

There is not to be found in the learned commentator's
treatise nor in any other upon the laws of England, reference
to a case where a court of equity undertook to enjoin the com-

mission of a criminal offense where property rights were not the foundation of the action and enjoining the offense a mere incident, whereby the rights of property might be protected and enjoyed. Nor is there to be found a case in the entire range of American adjudications, with the exception of liquor cases under special statutes of doubtful validity, in which a court of equity undertook to enjoin the commission of a criminal offense, or to prevent the continuance of a nuisance where the right of property was not the foundation of the action.

It is an elementary principle of equity jurisprudence that a court of equity has no jurisdiction to restrain the commission of crime, nor to enforce moral obligations or the performance of moral duties as such, nor can it rightfully interfere with the performance of an illegal act merely because it is illegal, in the absence of any injury to property rights. High, Injunctions (3d ed.), sec. 20; Morawetz, Corporations, sec. 1041; *The Debs Case*, 158 U. S. 564; *Cope v. Fair Ass'n*, 99 Ill. 489.

When private individuals suffer an injury quite distinct from that of the public in general, by consequence of a public nuisance, they are entitled to an injunction and relief in equity, which may thus compel the wrong-doer to refrain at once from his wrong-doing that inflicts injury upon the property of another. Story, Eq. Jur., secs. 924a, 925, and cases cited.

The public highways, the streets of cities, the navigable streams, the bays and harbors are the property of the public and every citizen of the commonwealth, has in him a vested right of enjoyment and user, and it may be conceded that the attorney-general on his own motion in behalf of the state has the right to institute proceedings by information in chancery to prevent obstructions and to abate nusiances thereon, without showing special injury or damage as would be necessary in the suit of a private individual.

Thus far and no farther have courts ever gone, and the jurisdiction in such cases is based not upon the right of the sovereign as such, but upon the trust imposed upon the sovereign to conserve and protect these properties for use and enjoyment by the people.

It is contended that the state, as the father of the people and guardian of the public morals, may invoke the aid of chancery to prevent persons engaging in those questionable pastimes and vicious pursuits which corrupt and destroy the virtue and manhood of youth, bringing upon the whole community degradation and distress, but such is not the law, as a close analysis of cases, both English and American, will clearly show. When King or Commonwealth invokes the aid of courts, it is in a representative or trust capacity, as suitor and not as sovereign.

When James I conceived the notion that he would rule in England as monarch absolute, a plan was devised to compass his designs through the court of high commission. This court, established by Elizabeth had not been provided with any fixed rules, and from its decision there was no appeal. An attempt was made in furtherance of this plan, to subject all persons, lay and spiritual, lord and peasant to its jurisdiction and to give it cognizance of all cases.

Instead of bringing suitors before the court by a citation, a pursuivant was sent to the house of any person complained of and against, to arrest and imprison him. Lord Chief Justice Coke, supported by his brethren of the common pleas, whenever appealed to, checked the usurpations by writs of prohibition. In the hope that Coke would no longer oppose its arbitrary assumptions, he was offered the position of one of its judges, but he resolutely declined the sinister proffer. The high commission being silenced for a time Archbishop Bancroft suggested the notable expedient of "the King judging whatever cause he pleased in his own person, free from all risk of prohibition or appeal." Accordingly one Sunday the King summoned all the judges before him and his council, and when they were assembled, the archbishop thus began:

"The judges are but the delegates of your majesty and administer the law in your name. What may be done by an agent may be done by the principal, therefore your majesty may take what causes you may be pleased to determine, from the determination of the judges, and determine them yourself. This is clear in Divinity; such authority doubtless belongs to the King by the Word of God in the scriptures." Thereupon

Chief Justice Coke made answer, all the judges assenting. "By the law of England, the King in his own person can not adjudge any cause, either criminal, as treason, felony, etc., or betwixt party and party concerning his inheritance or goods, but these matters ought to be determined in some court of justice. * * *

"So the King cannot arrest a man as laid down in the Year Book 1 H. VII. 7. 4, for the party can not have remedy against the King. So if the King give any judgment what remedy can the party have? * * *

"The law is the golden met-wand and measure to try the causes of your majesty's subjects, and it is by the law that your majesty is protected in safety and peace."

These quotations fully answer the contention that the King or Commonwealth has any standing in court other than as a representative or trustee. It is true the rule prevails that the King or sovereign may sue the subject and that the subject can not sue the sovereign without his consent, but the reason for such a rule is so patent to the profession, that discussion or explanation of its purpose would be needless.

But it is said that Mr. Justice Brewer in the Debs case (158 U. S. 564) held that the sovereign may appeal to a court of chancery to prevent infractions of the law irrespective of any property rights involved. After discussing the property rights of the United States, upon which the case was already decided, he proceeds: "We do not care to place our decision upon this ground alone. Every government, intrusted by the very terms of its being with powers and duties, to be exercised and discharged for the general welfare, has a right to apply to its courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrong-doing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court."

Entertaining as I do, the highest respect for the distinguished jurist, and a strong confidence in the correctness of

his opinions, I am prompted to demonstrate that his pronouncements in that case referred to, are not open to the construction given them by counsel.

The language of Justice Brewer must be construed in connection with the facts then before the court. By long and ancient usage, every citizen of the United States was entitled, upon the payment or tender of the reasonable or customary charges, to be carried from place to place and from state to state, over the great commercial highways of the nation: was entitled to transact business with persons residing in every town and hamlet of the republic, through the medium of the postal service of the government. These privileges, so long and universally exercised, under legal protection and judicial sanction, involving, as they do, so much of the industrial and commercial interests of the people, have grown into valuable property rights, which each and every citizen should be permitted to avail himself of, or to enjoy without let or hindrance.

These rights are akin to the right of the citizen to the free and unobstructed use and enjoyment, in a lawful and customary manner, of the king's highway. Even if the decision of the Debs case was based upon these considerations, which it is not, it would be no departure from established principles of equitable jurisprudence as applied to cases where the state appeals to chancery to enjoin the continuance of a nuisance on the public highway. So that the paragraph quoted from the Debs case does not bear the construction contended for, nor was it intended by the distinguished jurist who employed the language, that it should.

Having pointed out the jurisdiction of a court of equity, together with its limitations in respect to what may be called preventive justice, I pass to the consideration of another phase of the case.

The defendant in this case is a corporation created by the state of Illinois. It is an artificial being. It differs in that respect from a natural being, possessing no inalienable right to enjoy life, liberty and the pursuit of happiness, considered as individual prerogatives. It enjoys no greater privileges than

those conferred by its charter. It has legal rights, property rights, and vested rights, but no personal or natural rights. Its charter is its letter-of-attorney, which is in the nature of a contract with the state, that it will exercise the privileges and enjoy the benefits conferred upon it conformable with the grant. If it does not, the state may petition the court for annulment of its charter, not as sovereign in the capacity which the grant was made, but as suitor in its own court.

If the defendant is transcending its charter privileges, the state has a choice of remedy. It may proceed at law to annul the charter or invoke the aid of chancery to enjoin defendant from acting *ultra vires* to the detriment of the public. If the charter be a contract between the state and the corporation, as is conceded, the state has such a property right therein as will enable a court of equity to take jurisdiction of the cause, to ascertain whether the facts charged are true, and having acquired jurisdiction for any purpose, it may enjoin such acts on the part of defendant, as amount to infractions of the law, although such acts may be criminal in their nature. *The Attorney-General v. Railroad Co.*, 35 Wis. 425, and cases cited; *Attorney-General v. Jamaica Aqueduct Cor.*, 133 Mass. 361; *Attorney-General v. Oxford, Worcester & W. Ry.*, The Weekly Reporter, vol. 2, page 330; Opinion of Lord Romilly, Master of the Rolls. And see the elaborate and scholarly analysis of cases bearing upon the question here involved by Mr. Chief Justice Howard of Indiana, in *Columbian Athletic Club v. State ex rel. McMahan*, 143 Ind. 98, 40 N. E. 914; also Beach on Inj., secs. 1344, 1345.

If the court finds that the acts done by the corporation are not detrimental to the public interest, although such acts are *ultra vires*, it may, in its discretion, refuse an injunction. *Attorney-General v. Tudor Ice Co.*, 104 Mass. 239; *Stockton, Attorney-General v. Central R. R.*, 50 N. J. Eq. 52, 24 Atl. 964. Upon the facts admitted in the case, so far as the purpose of this motion is concerned, a court could have no discretion, and the motion to quash the writ issued against defendant corporation is denied.