Argued June 18, decided July 9, Rehearing denied Oct. 15, 1912.

**BUTTS *v.* PURDY.**

(125 Pac. 313.)
( 127 Pac. 25. )

**Deeds—Validity—Burden of Proof.**

1. In a suit to quiet title against a deed to defendant which plaintiff claims defendant forged, and which bears upon its face evidence of mutilation, the burden is on defendant to show a valid conveyance.

**Deeds—Forgery—Evidence—Sufficiency.**

2. In a suit to quiet title, evidence held to show a deed relied upon by defendant is a forgery.

**Evidence—Declarations by Decedent—Admissibility.**

3. On an issue as to whether a deed to defendant from plaintiff's intestate is a forgery, declarations of intestate while in possession of the property as to its ownership were admissible.

**Evidence—Notaries—Judicial Notice—"State Officer."**

4. A notary public is a "State officer," and the Supreme Court will take judicial notice of his accession, his official seal, and his continuance in office, and to inform itself respecting such facts will refer to the official records of the State department.

**Deeds—Cancellations—Execution—Pleading—Sufficiency— "Trick."**

5. A complaint stating that defendant threatened to bring ejectment against plaintiff claiming to own under a pretended deed land which belonged to plaintiff's decedent, that the deed was a forgery and "trick" on defendant's part to secure title and possession of the property, and thereby cheat and defraud decedent's estate, etc., is sufficient to warrant relief either on the theory that the deed was forged or obtained by some fraudulent device; the word "trick" as a noun meaning an artifice or stratagem; a crafty or deceitful contrivance or procedure, and meaning as a verb to deceive by cunning or artifice; to impose on; to defraud; cheat; to effect by deceit or trickery.

**Executors and Administrators—Action by Administrator—Leave of Court.**

6. Sections 1279, 1280, L. O. L., provide, in substance, that whenever the assets of an estate are not sufficient to satisfy the claims against it, and decedent in his lifetime has made a conveyance of realty with intent to defraud, etc., his creditors, the administrator shall petition the county court for leave to sue to cancel the conveyance. Held, that the statutes required that the permission of the county court be obtained to prosecute such action by the administrator.

**Executors and Administrators—Action by Administrator—Recovery of Realty Fraudulently Claimed.**

7. Under Section 516, L. O. L., providing that any person claiming an interest in realty not in the actual possession of another may maintain a suit in equity against another who claims an interest or estate therein adverse to him for the purpose of determining such conflicting claims, an administrator in possession of decedent's realty may invoke the aid of equity to protect his possession against a fraudulent claim thereto by another.

Parties—Capacity to Sue—Failure to Demur—Waiver of Defect.

8. Section 68, L. O. L., provides that defendant may demur to the complaint, when it appears upon its face that plaintiff has not the legal capacity to sue. Section 71 provides that, when any of the matters enumerated in Section 68 do not appear upon the face of the complaint, the objection may be taken by answer, and Section 72 provides that, if no objection be taken by demurrer or answer, defendant shall be deemed to have waived the same excepting only objection to the jurisdiction, and that the complaint does not state a cause of action. Held that, where the complaint showed upon its face that plaintiff had no capacity to sue, defendant by not demurring thereto on that ground waived the objection.

From Multnomah: HENRY E. McGINN, Judge.

Statement by MR. JUSTICE McBRIDE.

This is a suit brought by Agnes Butts, as administratrix of the estate of H. D. Winters, deceased, against the defendant, Will E. Purdy, to have declared void and canceled an alleged deed from H. D. Winters, plaintiff's intestate, to defendant. The complaint alleges, in substance, that Winters died intestate on June 20, 1911; that plaintiff was appointed administratrix of his estate and took possession of the real and personal property known to have belonged to deceased in his lifetime, the real estate consisting of lots 1, 2, 3, and 4, and the west half of lots 5 and 6, in block 114, East Portland; that on August 8, 1911, defendant served upon her a written notice to vacate the property above described, upon which was situated a large rooming house; that defendant is threatening to bring ejectment against plaintiff, claiming to be himself the owner of such property by reason of a pretended deed, alleged to have been dated, made, executed, acknowledged, and delivered to defendant by H. D. Winters on May 1, 1909. Plaintiff further alleges that the pretended deed of conveyance dated and acknowledged on May 1, 1909, is not, and was not, the deed of deceased; that the same was never signed or executed by him, and was never delivered by him to the

defendant; that it is a forgery and trick on the part of the defendant Will E. Purdy to secure the title and possession of the property and thereby cheat and defraud the estate of deceased; that the value of the property is about $65,000; that defendant never paid Winters anything for the property.

Defendant answered, denying the allegations of forgery and fraud in the execution of the deed, and by way of affirmative defense set up that the deed was made to him by Winters in due course and for a valuable consideration; that defendant thereby became the absolute owner of the property; that at the time the deed was made it was agreed between Winters and defendant that the deed should not be recorded; that the grantor should remain in possession of the property until his death; and that the rental value of the property is about $400 per month. The answer prayed for a decree quieting the title to the property in defendant, and that plaintiff be required to account to defendant for the rents and profits since June 20, 1911.

A reply denied defendant's title to the property, and admitted the value of the rents to be $400 per month. There was a trial before the court and findings made for plaintiff. Defendant appeals. Other facts appear in the opinion.                                AFFIRMED.

For appellant there was a brief over the names of *Mr. Thomas O'Day, Mr. Martin L. Pipes* and *Mr. J. M. Haddock,* with oral arguments by *Mr. O'Day* and *Mr. Pipes.*

For respondent there was a brief with oral arguments by *Mr. Cicero M. Idleman* and *Mr. R. Citron.*

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1, 2. This is a remarkable case. The defendant claims to be the owner of the property in dispute by reason of a conveyance from H. D. Winters, and, irrespective of the

question as to who introduced in evidence the deed under which he claims, the burden of proof is upon him to show, by a fair preponderance of the evidence, that he holds a conveyance to the property made to him by Winters. He produces an instrument purporting to be such a deed, but bearing upon its face evidences of mutilation for which he attempts to account. His own story is in itself improbable in so many particulars that we are unable to convince ourselves of its truth.

Before discussing the evidence, we will briefly review the relations of the principal parties. Winters at the date of the pretended deed was a man 77 or 78 years old. He was a miser, sordid and suspicious in character, and had accumulated, by shrewd business dealing, the property in question upon which was situated a large rooming house and other buildings, from which he derived a rental of about $400 per month. His eyesight was poor, but his general health is not shown to have been very greatly impaired for a man of his years until shortly before his death. For several years before the 1st day of May, 1909, he had been associated with defendant and one M. B. Evans in a real estate corporation, known as the "Purdy Investment Company," and was one of its officers, and in that capacity or in his individual capacity had frequently signed deeds and other papers which were acknowledged in Purdy's office. In June or July, 1909, Evans went to Winters, and informed him that Purdy had forged a deed to all his (Winters') property, that he had signed as a witness upon a promise from Purdy that he should receive $10,000 for so doing, and that Miss Pratt, a notary and stenographer in the office, had signed as the other witness. Evans then disappeared, but subsequently was heard of in Tacoma, where he gave out statements reflecting upon the business of the corporation and upon Purdy. These statements being published in the Portland papers, a statement

written by Purdy and signed by Winters and himself was printed in the Daily Journal, in which they say, among other things, that:

"He [Evans] approached Mr. Winters with the story that Mr. Purdy had tried to sell his (Winters') property, claiming to have in his possession a deed covering all of the said property, and that he himself had seen and signed the deed on a promise of $10,000 cash, claiming also that the young lady in our office, who is a notary public, had acknowledged, also signed the deed as a witness. In this, his last effort, he met with failure; accordingly he left for parts unknown, but stating he was going to Tacoma, and would be gone for three or four days. This proposition of legal documents being forged, or having lost faith in his business associates is the last chapter or act in the drama," etc.

Appended to this statement is the following statement by Miss Pratt:

"I, M. B. Pratt, notary public and stenographer in the office of the Will E. Purdy Investment Company, assert that I have not acknowledged or signed any such deed as mentioned by M. B. Evans in the published article.
                                   "M. B. Pratt."

The Purdy Investment Company went out of business shortly after this episode, and business relations between Purdy and Winters seem to have substantially terminated about September of the same year.

Purdy's story is substantially that for some time prior to May 1, 1909, Winters had intimated that he would give him this property, and that on the 1st of May he went over to Winters' place, and Winters said to him that he had had a bad spell the night before, and remarked:

"I was thinking last night I was done for; and, if I had gone, I suppose the estate would have gotten all the money that belonged to you, because you have no papers. I am coming over today and settle the matter up, and I am going to give you a deed to this property."

That he came over to the office at 2 o'clock and asked Purdy if he had a blank deed. Witness got out the deed and proposed to have Miss Pratt typewrite the description, but Winters said, "No, * * write it yourself;" that witness then wrote the deed which appears to be a deed of general warranty, Winters giving him the description from memory. When it was written, Winters went out to find a witness and brought in Weigle, who had an office near by, and who had formerly been an associate with witness in business, that, when he returned, Winters signed the deed and Weigle and Miss Pratt signed as witnesses; that witness paid Winters $1, the nominal consideration, and handed him the deed after Miss Pratt had taken his acknowledgment; that, in addition to the nominal consideration, Winters actually owed him $11,300, which he had left with him as a sort of deposit.

His account of this $11,300 fund is substantially as follows:

"Besides that there was about $11,000 and $300 in property and money that had been loaned to Mr. Winters by myself, and this was a part of the consideration for this deed. I sold him property, and, when I would sell him property, he would give me a receipt for it, and I considered it just like putting it in the bank. I considered Winters good, and I wanted to lay by a certain amount of money so that I would have it when I wanted it, and I was laying by this money and giving it to Mr. Winters and holding his receipt for it. He has got the receipts, I suppose, or did have them. I gave them back to him when this deed was given to me. They represented $11,300 besides interest money I had let him have and property I had deeded to him. * * I said it was property and cash (the $11,300). The property was two lots and a seven-room house in Mansfield addition. * * This was about seven years ago. The value of the property was $2,500, but the balance that he owed me was $1,650, for which I took a written agreement. From time to time I returned his agreements, and took one

from him for a larger amount. I returned the first
agreement at the time I sold him an interest in eight
lots and two houses. I drew the agreement, and he
signed it. * * I kept no copy of the agreement. Six,
eight, or ten months after the Mansfield addition trans-
cation I sold him a half interest in two houses and eight
lots in Corona Park addition. Property was worth
$3,500. Half interest was mine. That would be $1,750
coming to me. I returned the first agreement and took
one then for $3,400. * * I kept no copy of it, have no
record at all. I added it to the next sale. I have not
got the deeds here, but the next transaction was an
equity in 40 acres at Buelle, Wash. I deeded Mr. Win-
ters the property, subject to an installment contract.
The equity, I think, was somewhere from $1,200 to
$1,500. * * I then gave back the previous agreement,
and took a large one. I then sold Mr. Winters my equity
in Mississippi avenue addition property in Multnomah
addition. I think I had $1,000 coming. I then turned
the last agreement back to Mr. Winters. I had a room-
ing house, and I sold it, and got $1,000. I then sold that
to Mr. Winters, and I took another agreement. * * I
returned the last agreement to Mr. Winters when I gave
him $800 that I sold some property in Newberg for.

Q. How did you give him this $800? By check?

A. No. I gave it to him in cash, I think, although I
could not say.

Q. Where did you have it when you gave it to him?
Did you draw it out of the bank somewhere?

A. I would not say at the present time, because I
never thought I would ever have to give an account of
such things again.

Q. Where were you keeping your account at that time?

A. All my banking business at that time, and for the
last eight years, have been done in the United States
National Bank at Newberg. This was five or six years
ago. I returned the last agreement to Mr. Winters when
I sold a mortgage I had on a farm in the Nehalem coun-
try for $1,000, and I turned it over to Mr. Winters.
Cannot say whether I had given him a check or not.
I returned the last mortgage to Mr. Winters when I sold

a lot on the boulevard, on the St. John car line, for $500. This was four or five years ago, and I turned this money over to Mr. Winters. Cannot say whether it was cash or check, and took a new agreement. * * I returned this agreement to Mr. Winters when I sold a house on Ninth street, on the East side; price of it was $2,500, and I gave Mr. Winters $1,000 of it. This, I think, was four years ago. I returned that agreement when I sold a lot in Albina, corner of Stanton, for $800, and I turned that over to Mr. Winters. I think that was the last agreement I had. I returned that to him when he gave me a deed for this property. During this time I borrowed considerable sums of money from time to time from Mr. Winters during the same period of time. * * He was a man of large wealth and means, and during the same five or six years I was selling property and taking agreements from him he was loaning me money from time to time, and sometimes I gave him my note. I would go to Mr. Winters and say, 'I want $2,000, and do not want it to interfere with our other transactions at all. I want it for a few days'—and he would give it to me, and he would lay the money down on the table, and he never took a scratch of the pen for it—only my word. Many and many a day he has done this, and many and many a time. * * I did not consider that I was loaning Mr. Winters any money when I took this agreement from him. I was putting it there for safe-keeping. It was the same as though I was putting it in the bank, I considered. He was loaning me money at the time. * * I could not tell you now when I borrowed the last money from him, but I know it has been quite a while. I could not tell you how much I borrowed. It was so often that I did that when I was in business. You know, I have not been in business down there for over two years now."

The witness also testified that one of the reasons for the conveyance was that he had promised to retain the name "Winters Block" to the property, and that it was verbally agreed that Winters was to retain the possession and income from the property during his lifetime. Purdy goes on to state that he took the deed out to his place at Butteville, and, after keeping it for five or six weeks, put it in an envelope and placed it in a glass fruit

jar, which was covered with a tin lid, and buried it on the bank of the river, about 2½ feet beneath the surface of the ground. Here it remained until August, 1910, when Winters told witness that to satisfy himself as to the statement of Evans, made in July, 1909, as to a forged deed, conveying all his property being in Purdy's possession, he would like to have him bring the deed down and let him see it. Purdy says that he promised to do so, but forgot it, and that finally, some time in the month of August, 1910, Winters came out to Butteville, and witness disinterred the deed and required Winters to give him a receipt for it to prevent his taking it away or destroying it. He states that, after Winters examined the deed, he expressed himself satisfied and went back home, Purdy giving him a check on the local bank to pay his expenses; that Mrs. Purdy was not at home on the day of Winters' visit, and that nobody was present at the disinterment except himself and Winters. He said that he would produce the check he had given Winters later on in the trial, but he failed to do so. The witness states that the deed was dug up the second time on August 4, 1911, six weeks after Winters' death, in the presence of several persons; that it was damp and mouldy, and the names of the witnesses almost obliterated; that he sent for Weigle to come up, and on the 6th day of August Weigle came, and, as his signature appeared very dim, it was finally suggested by the notary that he should retrace it, which was done. Miss Pratt was sent for and came out the same day and identified her signature. The deed was then sent to Multnomah county for record.

Before referring to the testimony of Wiegle and Miss Pratt as to the execution of the deed, it seems proper to point out certain improbabilities in the account given of the matter by Purdy. It is improbable in the first instance that Winters, who was an old man past the age

of active business, would convey the bulk of his property and apparently all of it that produced any income, without taking some assurance in writing that Purdy would perform his part of the agreement, and to allow him to have the possession and use of it during his lifetime. Winters seems to have been a keen, calculating business man, careful and even miserly and stingy in money matters, and such a course would have been contrary to his usual habits and character. Granting that he had confidence in Purdy's integrity, he could not be sure that Purdy could outlive him, or that in the event of his death Purdy's heirs would carry out his secret verbal agreement. Moreover, the property was incumbered with a mortgage which in the event of Purdy's death would have to be repaid out of Winters' other property. We do not believe that Winters was foolish enough or unbusinesslike enough to have done an act so inconsistent with his character and habits. It is all but incredible. Outside of Purdy's own testimony no intimate, personal relations are shown to have existed between Winters and defendant. Winters was old and lonely, but it is not shown that he visited with the Purdy family or they with him, or that at any time he was the recipient of any of those kindly attentions from defendant or his family which might tend to awaken his gratitude or generosity. Their intercourse seems to have been of a strictly business character, fairly friendly most of the time, but not such as to awaken in a man of Winters' age and habits a desire to practically make Purdy the recipient of his wealth. That he did not trust Purdy completely is shown by his conduct in the Evans' episode. He was doubtful and proceeded to make inquiries to ascertain whether Purdy had actually concocted a forged deed to his property, and it is a significant fact also that, when he talked with Purdy and Miss Pratt about Evans' charges against Purdy, neither he nor they, according to the testimony of Purdy and Miss Pratt, ever referred to the alleged

deed of May 1st, which had been executed only six weeks before. He asked Miss Pratt if she had certified to or witnessed the deed Evans referred to, and she contented herself by replying in the negative. Now what would have been more natural than for her to have said:

"No, Mr. Winters; I never saw nor heard of any other deed from you to Mr. Purdy than the one you acknowledged before me a few weeks ago."

She contented herself with making practically the technical answer that she knew nothing about a deed conveying all his property. Both Purdy and this witness seem to have been particularly careful not to remind him of the alleged deed of May 1st. This may have happened just the way these witnesses say it did, and this omission to mention the transaction of May 1st has been mere forgetfulness or a mere coincidence, but, to say the least, it seems unnatural under all the circumstances.

The alleged burial of the deed is another peculiar and unnatural circumstance. Purdy himself gives no reason for this, though Miss Pratt and Weigle state that, when it was executed, either Winters or Purdy, or both, requested that the fact of its execution be kept secret. According to Purdy's statement, it was buried in a jar without any rubber to protect it from dampness. He was a business man who had a bank account and transacted business with the bank. The natural thing for him to have done would have been to put it safely away in the bank, but instead of this he would have it believed that he buried it secretly, not even telling his wife its whereabouts, and that he left the evidence of a fortune lying in the ground in an insecure receptacle where it would have been lost to his wife and family in case of accident to himself.

The story of Winters' coming to Butteville is not supported by any circumstance. The alleged visit was

nearly or quite a year after Evans had made the accusation in regard to the forged deed. Winters, if he in fact signed the deed in suit here, presumably knew he had signed it, and the affair was a closed incident. Nobody saw him at Purdy's or at Wilsonville on his way home, and his housekeeper is positive that he never made the visit. Purdy declared that he could produce the check given by him to Winters for the expenses of the trip, and promised to do so before the close of the trial, but it was not produced. Mrs. Purdy was absent, and the children seem to have been away also. The alleged reason for the visit is absurd, considering the circumstances, and we do not believe it ever took place. Purdy's account of the visit also throws a peculiar side light on the relations of the parties when he tells us that he did not permit the friend, who had such confidence in him that he was willing to convey to him the bulk of his income-bearing property, without a line of acknowledgment or guaranty of good faith, to examine the document until he had extorted from him a receipt for the deed. Then he allowed him to handle it. In brief, this confiding and affectionate friend who so loved him that he was willing to trust him with the bulk of his property thought he might be a forger, and defendant thought that this same friend might be treacherous enough to destroy the deed if he got it into his hands. We do not believe the alleged visit was ever made.

The alleged consideration of $11,300 also seems apocryphal. Purdy was a business man of experience. For his own convenience he would have kept some memorandum of these large transactions and deposits with Winters. Winters was a man of wealth, but old and not likely to assume the burden of acting as a gratuitous custodian of Purdy's earnings, and it is in evidence that Purdy was a frequent borrower from him. He produces not a single writing, check, or receipt indicating that

such deposits were ever made. His books of account are strangely absent. In September, 1910, Winters stated in an answer to a complaint filed against him in the state of Washington that in August, 1909, and for a long time prior thereto, Purdy was indebted to him in the sum of $2,050. The alleged indebtedness of Winters to defendant is supported solely by Purdy's testimony, and seems improbable.

3. The declarations of Winters, while in possession of the property as to his ownership are admissible. These declarations, as well as his conduct, in regard to it, tend to show that he had never consciously conveyed away the title. We find from the testimony of disinterested and credible witnesses that in December, 1910, and up to a short time before his death, Winters, an ardent prohibitionist, was in communication with a temperance organization in Portland with a view to the construction of a building on the premises, which should include a hall for the meeting of the society, and which building should eventually become the property of that organization, and that he had even gone so far as to order and receive plans for its structure. It is in evidence that he had entered into preliminary negotiations in writing with Mrs. Rutledge to lease her the rooming house for five years at $150 per month with the privilege of renewal, and had told her that he contemplated visiting his daughter and grandchildren in New York.

Mrs. Maxwell testifies that Winters told her at the time of the Evans' trouble that, if Purdy had a deed to the property, it was a forgery. Mrs. Crocker and Thomas Groome testify to the same effect. Outside of the testimony of the subscribing witnesses, there is little testimony as to the genuineness of the deed. F. S. Fields testified that from a comparison of handwriting he was satisfied in his own mind that it bore Winters' genuine signature, but shows no qualifications as an expert in

handwriting beyond the fact that he is county clerk. A man may be an excellent clerk, and yet be a poor judge of handwriting. But one specimen of Winters' true handwriting accompanies the transcript, and, while a comparison of that with the signature to the deed discloses a general similarity, there are dissimilarities equally marked, and no expert can say from the specimen submitted that the signature is genuine. Winters' genuine signature is composed of very simple lines which are readily susceptible to imitation.

The date in the deed itself is blurred and obscured by what is either a fading of the figures or by an erasure of the first figure of the date. It appears thus: "This 1th. day of May," etc. Now Purdy had written too many deeds and had too much education to write "1th" for "1st." The conclusion from the appearance of the document is almost irresistible that the date has been "doctored" from some date like 10th, 20th, or 30th, to 1th, and that by some slip the letters "th" have been allowed to stand as they were originally written.

The testimony of the subscribing witnesses is the sheet anchor of defendant's case. One was a stenographer in the office of the Purdy Real Estate Company and the other a former business associate of defendant. Giving each of these witnesses credit for entire honesty, their testimony fails to overcome in our minds the impression made by the testimony before recited. Winters had dealt with so many people and executed so many papers that it would be very easy for a shrewd man like Purdy to mislead them as to a particular date. We are satisfied that this deed was never executed nor acknowledged by Winters in May, 1909, and one reason for this opinion is conclusive.

4. A notary public is a State officer, and this court will take judicial notice of his accession, his official seal and his continuance in office, and, for the purpose of

informing itself in relation to such facts, will refer to the official records of the State department. *State* v. *Main,* 69 Conn. 123 (37 Atl. 80: 36 L. R. A. 623: 61 Am. St. Rep. 30) ; *State* v. *Morris,* 47 Conn. 179. So informed, we find that Miss Pratt was appointed a notary public for the first time on the 5th day of May, 1909, and that on the 8th day of May, 1909, she filed her bond and oath of office, and thereby became qualified to act. Her bond is dated May 1st, and Winters was her surety. It is not probable that a young woman going into office for the first time would assume to act before she had been appointed and had filed her oath of office. A notary holding over might inadvertently continue to act in the interim between the expiration of his old commission and his reappointment, but it is not likely that a new applicant would begin her duties before any appointment had been made. Of course, the acknowledgment of the deed in itself is of no moment so far as this case is concerned as a deed otherwise valid would still be so between the parties without any acknowledgment whatever, but the circumstance above adverted to is important as it affects the value and accuracy of the witnesses' testimony. If Miss Pratt had been deceived, tricked, or persuaded into antedating the acknowledgment, to what extent has the deception extended? We are willing to credit her statement that at some time Winters executed some instrument in her presence, but that he so consciously executed the deed in question, we doubt.

Weigle's testimony is practically the same as Miss Pratt's, but there are some unusual features in it. He testifies that Winters came and requested him to witness a deed, and that, when he got to the office, they informed him it was a deed to Mr. Winters' Grand Avenue property. It is not usual that a person who is called upon for such a purpose is informed of the contents of the

instrument he is called upon to witness, but what makes
the circumstance more peculiar is that, after the deed
was executed and delivered, "they" (Winters or Purdy,
or both) asked him to keep the transaction secret.   That
they should first deviate from the usual course of busi-
ness and unnecessarily inform him of the contents of
the instrument, and then asked him to say nothing about
the transaction, is singular to say the least.   He is evi-
dently a prejudiced witness and not at all a fair one,
as the following extract from his testimony on cross-
examination will show.   Being interrogated by counsel
for plaintiff as to previous statements made to them, the
following colloquy occurred:

"Q. Did you say anything to us that day about your
name fading?

"A. How is that?

"Q. Did you say anything to us that day about your
name fading here?

"A. Yes; I think I did.

"Q. What did you say about that?

"A. No, no; I don't think that was talked about at all,
about my name having faded that way.   I don't think
it was, because my name didn't have the appearance of
fading on that deed.

"Q. Well, what did you say on that day about the signa-
ture on that deed was not the signature at the time it
was executed?

"A. You asked me why my name was so much dimmer
than the others?

"Q. And didn't you say to Mr. McCarthy and myself
on that day that your name, as it appeared on that deed,
was as it appeared originally?   And it was the only
time you put your name there?

"A. No; I didn't say that.

"Q. Are you certain about that?

"A. Well, yes; I hedged myself pretty well.   I didn't
like to state a falsehood, but I told you I did not retrace
my name there.

"Q. You hedged yourself, you say?

"A. Yes, I did—I did not want to say I had written
my name on that day up there.

"Q. Why didn't you?

"A. Well, I wanted to tell the truth. I told you I had not retraced it. I was not under any obligation to tell you all that I knew.

"Q. Well, it would not have hurt you. It would not have done you any harm.

"A. No, sir.

"Q. Then why didn't you tell us the exact facts?

"A. Because I did not think you had any right to ask me those things. You came to me to learn all that I knew about it that day.

"Q. But we treated you very nicely?

"A. Oh, yes sir.

"Q. And we were frank in our conversation with you?

"A. Yes, sir; you were.

"Q. And we asked you very nicely about this matter?

"A. Yes, sir.

"Q. And why did you evade us?

"A. Well, simply because I did not think very material of you. I thought all you were trying to learn was what I knew about this, and I thought you were trying to learn something more than I wanted you to know.

"Q. Well, why didn't you want us to know that that was your signature, if it had been put regularly upon that deed?

"A. I told you.

"Q. Well, just answer that question. Why didn't you tell us that was your signature, and why did you evade the question we were asking you?

A. "I did not tell you, because I did not want to tell you on that day.

"Q. And that is the only explanation you can give?

"A. Yes; and that is enough too."

He may have been misled by Purdy into believing that the dim characters on the deed shown him at Wilsonville were the remains of his original signature. He was no doubt ready to do anything he could to assist his old friend and partner and willing to suppress the truth to do so, as the above extract from his testimony

indicates. Without further discussing the testimony, which is voluminous, we are of the opinion that the deed in question is not shown to have been the genuine deed of H. D. Winters, but that it is either a forgery outright or was obtained by some trick or device, whereby he affixed his name to the instrument in ignorance of its real nature.

5. While the complaint is not ample in its terms, we think it is broad enough to cover a case for relief either under an allegation that the deed was forged or obtained by some fraudulent device. The word "trick" used on the complaint in connection with other allegations is defined as "an artifice or stratagem; a crafty or deceitful contrivance or procedure." As a verb it signifies "to deceive by cunning or artifice; to impose on; to defraud; cheat; to effect by deceit or trickery." No demurrer or motion to make more definite was interposed, and the case was tried as though the allegations of fraudulent conduct were ample. The judge of the court below saw and heard personally the principal witnesses in the case, and in that respect was much better qualified to judge of their credibility than we. There is too much mystery and improbability in defendant's account of this transaction for us to accept it as true.

The decree of the circuit court is affirmed.

AFFIRMED.

---

Decided October 15, 1912.

## ON PETITION FOR REHEARING.

(127 Pac. 25.)

MR. JUSTICE BURNETT delivered the opinion of the court.

The plaintiff, in her representative capacity as administratrix of the estate of H. J. Winters, deceased, brought this suit, alleging that she was in possession of certain real property belonging to the estate, and charging that

the defendant claimed title thereto by virtue of a forged deed, purporting to have been executed by Winters in his lifetime. She prayed for a cancellation of the deed; that her right and possession to the real property be divested from any claim or interest on behalf of the defendant by virtue of the deed; that he be restrained from molesting her possession as such administratrix and for other relief. The defendant answered, traversing the complaint, avowed the validity of the deed, and his right to the real property, and prayed that his title to the premises might be quieted. The new matter of the answer having been put in issue, a trial resulted in a decree in favor of the plaintiff, which was affirmed by this court in an opinion by Mr. McBRIDE (63 Or. 150 (125 Pac. 313).

6. Having retained new counsel, defendant filed a petition for a rehearing, predicated upon the assumption that this is a suit by an administrator under Sections 1279 and 1280, L. O. L. These provide, in substance, that whenever the assets of an estate are insufficient to satisfy the claims against it and the decedent shall in his lifetime have made or suffered a conveyance of real property, with intent to hinder, delay, or defraud his creditors, it is the duty of the executor or the administrator to petition the county court for leave to sue for a cancellation of the conveyance. It is made the duty of the county court to grant permission for the prosecution of such litigation if, upon the application, it appears that the assets are insufficient for the liquidation of the debts, and it is probable that the conveyance was fraudulent as alleged. In *King* v. *Boyd,* 4 Or. 326, these statutory requirements were construed, and it was very properly held, by this court, that the suit described in those sections could not be commenced without leave of the county court upon a proper petition for that purpose. The petition for rehearing is based almost entirely upon the doctrine announced in that case.

7. The later case of *Ladd* v. *Mills*, 44 Or. 224 (75 Pac. 141), distinguishes it, however, and holds expressly that an administrator in possession of the real property of his decedent has a right under Section 516, L. O. L., to bring a suit in equity against another who claims an interest or estate in the realty in question, adverse to the administrator, for the purpose of determining such conflicting or adverse claims. Under that section, an administrator in possession of his decedent's real estate, as here alleged, has a right to the aid of a court of equity in protecting his possession against a claim based upon a fictitious deed. The present case is also distinguishable from the class of cases of which *King* v. *Boyd* is a type on the further grounds that in such instances the relief is sought against the affirmative fraudulent acts of the decedent himself, whereby he has undertaken to place his property beyond the reach of his creditors. In this case the relief is not sought against the act of the decedent, but against the acts of the defendant himself, whereby he is alleged to have trumped up a baseless, fraudulent claim to the property in the actual possession of the administrator.

8. There is yet another reason why the petition for rehearing cannot receive our sanction. If the plaintiff had no capacity or authority to institute this suit, that fact was patent on the face of the complaint. Without urging the question, the defendant answered to the merits, challenging the allegations of the complaint and asserting title in himself by virtue of the deed in question. Section 68, L. O. L., provides that:

"The defendant may demur to the complaint, within the time required by law to appear and answer, when it appears upon the face thereof either: (1) That the court has no jurisdiction of the person of the defendant or the subject of the action; or that (2) the plaintiff has not legal capacity to sue; or * * (6) that the complaint does not state facts sufficient to constitute a cause of action. * * "

Section 71, L. O. L., says that:

"When any of the matters enumerated in Section 68 do not appear upon the face of the complaint, the objection may be taken by answer."

Section 72, L. O. L., reads thus:

"If no objection is taken, either by demurrer or answer, the defendant shall be deemed to have waived the same, excepting only the objection to the jurisdiction of the court and the objection that the complaint does not state facts sufficient to constitute a cause of action."

If, indeed, the defendant is claiming title to the premises in dispute by virtue of a false and forged deed, some one could bring a suit against him to quiet the title or remove a cloud. In effect, the petition for rehearing says "this may all be true but the plaintiff has not legal capacity to urge such a suit." Having been attacked by a complaint, upon the face of which this objection was apparent the defendant should have demurred, and, not having done so, his objection is waived by virtue of the provisions of Section 72, L. O. L. *Wilson* v. *Wilson*, 26 Or. 251 (38 Pac. 185); *Owings* v. *Turner*, 48 Or. 462 (87 Pac. 160).

The petition for rehearing is denied.

                    Affirmed: Rehearing Denied.