Argued at Pendleton May 8, affirmed July 9, 1929.

STATE *v.* LEE CHUE.

(279 Pac. 285.)

For appellant there was a brief over the names of *Mr. William Smith* and *Mr. A. S. Grant,* with an oral argument by *Mr. Smith.*

For respondent there was a brief over the names of *Mr. Leland S. Finch,* District Attorney, and *Messrs. Nichols, Hallock & Donald,* with an oral argument by *Mr. Blaine Hallock.*

McBRIDE, J.—The defendant was indicted for the crime of unlawfully practicing medicine without a license. He was convicted and appeals. The indictment is as follows:

"The said D. R. Lee (Lee Chue) on the 16th day of August, 1928, in the County of Baker, State of Oregon, did then and there unlawfully practice medicine without a license, without first having obtained a license from the Board of Medical Examiners of the State of Oregon entitling him to so practice, and did then and there unlawfully for a fee prescribe, direct and recommend the use by the said A. H. Davis of certain drugs and medicine for the treatment, cure and relief of certain bodily injuries, infirmities and disease, a more particular description of which drugs and medicine is to this complainant unknown."

Section 8552, Or. L., as amended by Section 7, Chapter 452, General Laws of Oregon, 1927, provides that any person, with certain exceptions hereinafter noted, who desires to practice medicine or surgery in this state, shall apply to the State Board of Medical Examiners for a license to practice such profession, and requires him to pass the examination prescribed therein before obtaining such license.

Penalties are imposed for practicing without such license. Section 13 of the act is as follows:

"Except as provided in section 15 of this act, no person shall practice medicine or surgery in this state without being licensed so to do by the state board of medical examiners. A person shall be regarded as practicing medicine and surgery within the meaning of this act if he shall either (1) advertise, or hold out to the public, or represent in any manner that he is authorized to practice medicine or surgery in this state; or (2) for compensation directly or indirectly received or to be received, offer or undertake to prescribe, give or administer, any drug or medicine for the use of any other person; or (3) offer or undertake to perform any surgical operation upon any person; or (4) offer or undertake to diagnose, cure or treat in any manner any disease, illness, pain, wound, fracture, infirmity, deformity, defect or abnormal physical or mental condition of any person; or (5) who shall append the letters 'M. D.' or 'M. B.' to his name, or use the words 'Doctor,' or 'Physician,' or 'Surgeon' or 'Professor,' or 'Healer,' or 'Specialist,' or any abbreviation or combination thereof, or any letters or words of similar import in connection with his name, or any trade name in which he is interested, in the conduct of any occupation or profession pertaining to the diagnosis or treatment of human diseases or conditions herein mentioned; or (6) act as the representative or agent of any person in doing any of the things mentioned in subdivisions (1), (2), (3), (4) or (5) of this section. Any person who violates any of the provisions of this section shall be guilty of a misdemeanor. In any prosecution for the violation of any of the provisions of this section, it shall be sufficient to sustain a conviction to show a single act of conduct in violation of any of the provisions of this section, and it shall not be necessary to show a general course of such conduct."

Section 14 contains a number of exemptions, among which are the following:

"(9) The practice of the religion of persons who endeavor to prevent or cure disease or suffering by prayer or other spiritual means in accordance with the tenets of any church; nor shall anything in this act be construed so as to interfere in any manner with the individual's right to select or employ the practitioner or mode of treatment of his choice, or to interfere with the right of the person so employed to give the treatment so chosen; provided, however, that sanitary laws, rules and regulations are complied with."

The testimony introduced by the state is to the effect that the chief witness for the state, in reality acting as special agent on behalf of the State Board of Medical Examiners, went to defendant's place of business, where the following occurred:

"We entered his office, he asked me what he could do for me. I told him I was in a run down condition—which I was—and I was about fifteen pounds light. He disagnosed my case by feeling my pulse—felt my pulse at both wrists, and he told me I had indigestion, constipation, poor circulation and gas on the stomach. He told me he could fix me up; said I would have to come back later and he would have my medicine ready for me at about six o'clock that evening.

"Q. Was anything else said at that time? A. He tried to explain to me what condition my system was in, and when I started to go he said he wanted his pay at that time. I asked him how much it was and he said it was $5.00, and I gave him $5.00 at that time.

"Q. That was on the first visit? A. Yes, sir.

"Q. Were you at the defendant's place any more that day, at any other time? A. About six o'clock that evening I went back and got the medicine and at that time he told me how to take the medicine.

"Q. What was said at that time between yourself and the defendant? A. Well, nothing very much, only he told me to take a cupful three times a day.

"Q. Was anyone else present besides yourself and the defendant on that occasion? A. Mrs. Davis was present."

His testimony was corroborated by Mrs. Davis. He took the medicine with him and it was received in evidence on the trial. It was admitted that defendant had no license at the time of the sale. The case was tried to a jury, and from a judgment on a verdict of guilty defendant appeals.

■ Counsel for defendant raises but two questions on appeal. The first is that there was no evidence to prove the existence of the State Board of Medical Examiners. We of course take judicial notice of the fact that by virtue of an act of the legislature approved February 23, 1895, the Governor was required to appoint a board consisting of five persons, to act as a board of examiners of persons desiring to practice medicine and surgery in this state. The first section of this act now constitutes Section 8548, Or. L. We take judicial notice that by act of the legislature now in force, the membership of the board consisted, at the time the instant case was tried, of six members, including a treasurer. The board functions as a state board, and the members of it are state officers; and we take judicial notice, not only of the existence of such board, but of the accession to office and the duration of the term of each of its members. We therefore take notice that the membership of the board had been continuous from the creation thereof until the date when the alleged offense was committed, and that at that date the membership was as follows: J. F. Wood, Luther H. Howland, C. H. Mathes, J. H. Bessom, M. K. Hall and C. G. Patterson: *Butts* v. *Purdy*, 63 Or. 150, 164 (125 Pac. 313).

Counsel for defendant cite *United States* v. *Williams*, 5 Cranch C. C. 62, 28 Fed. Cas. (No. 16,713) 660, but that case is not in point here. In that case Congress granted a charter (there being no general law for the formation of corporations as in this state) to certain physicians therein named and to such successors as they should from time to time name, declaring them to be a corporation under the name of "The Medical Society of the District of Columbia," and authorizing it to hold property not exceeding $6,000 and apply the same "to such purposes as they may deem most conducive to the * * disseminating of medical and surgical knowledge." By the second section of the act they were to hold four stated meetings each year, on the first Monday of January, April, July and October, and were to have a president, secretary and other officers, "to be appointed on the second Monday of March, * * , and on the annual meeting in January forever thereafter (not less than seven members being present at such meeting)." So far, the body thus formed was a private corporation, not different from usual corporations which in those times were generally created by act of the legislature. But the next section conferred upon the corporation the extraordinary privilege of examination of applicants for licenses to practice medicine and surgery, and provided that the corporation (not less than seven members being in attendance) might elect by ballot five persons who should be styled "The Medical Board of Examiners of the District of Columbia," whose duty it should be to examine applicants, and, in proper cases, grant licenses to practice, etc. By the fifth section it was enacted that any person practicing without such license should be subject to a penalty of $50 for each offense, one half to the use of

the society, and one half to the informer. The defendant Williams was indicted for violation of this section by practicing without a license. Other counts not necessary to enumerate here charged other kindred offenses. It was contended by the defense upon the facts disclosed on the trial that the corporation had become dissolved or was dead by nonuser of its charter, and the court gave this instruction to the jury:

"If the jury believe from the evidence that the medical association omitted intentionally to elect the president, vice-president, secretary and treasurer of the said society for several years after the organization of the society, at the times directed by the charter, and neglected to fill up the vacancies which occurred in the said medical board; and that one or more of the members of the said association withdrew themselves therefrom, declaring that they considered the said corporation as dissolved; and, further, that the said association determined, by resolve of the board, to divide the property and effects of the said society among the individual members thereof; that then the jury may find that there was a surrender of the corporate franchises and privileges of said society, and that the said corporation was dissolved. And if the aforegoing state of things existed at the time charged in the said indictments when the offense was committed, they ought to find the traverser not guilty."

The defendant was acquitted. The report was unofficial, and seems to be taken from the memoranda of Justice CRANCH, who presided at the trial. There is some confusion as to the facts and as to the holdings, as each justice from time to time during the proceeding expressed apparently offhand opinions as to various phases of the case. But we think that we have fairly stated the substance of the contention,

so far as it may apply to the case at bar. It will be observed in the first place that the medical association was a private voluntary corporation, entitled to hold property and "disseminate medical and surgical knowledge," just as a manufacturing corporation would have been entitled to build a factory and dispose of its product. As such voluntary corporation, it was subject to dissolution, either voluntary or otherwise, or by nonuser of its franchise. The act organizing it is similar in some respects, though not altogether, to the old acts providing for the incorporation of our transcontinental railroads when certain persons named in the acts were granted the privilege of incorporating for the purpose of building a railroad, and were thereupon, on complying with the conditions named, granted lands subject to the performance by them of the conditions of the act. In the Williams case the medical association was incorporated subject to certain conditions as to its continuity. Subject to the performance of certain conditions, it was granted the sole privilege of licensing applicants for the right to practice medicine. If it failed to perform these conditions, its right to license ceased. If it voluntarily dissolved or lost its corporate powers by nonuser, there was nothing left for the grant to act upon. "Where the reason of the rule ceases, the rule ceases." The requirement that an applicant should obtain a license from a board appointed by the association could have no application to a case where the corporation had become moribund or dead, and therefore incapable of appointing such a board, and this was what was held in that case, which is good law, but has no application here.

■ Here the Board of Medical Examiners is an arm of the state, established by law for a continuous pur-

pose. Its existence or duration does not depend on the volition or even the misconduct of its members. If every member should die or resign and the Governor for some reason should fail for a time to appoint others and later appoint a new board, they would be officers *de jure* because the law makes them so. We take judicial notice, however, that neither of these contingencies has happened, and that the "Apostolic Succession" of doctors has continued in an unbroken line from 1895 until the present.

The next and final objection of course is to the refusal of the court to give the following instruction:

"I instruct you that the statute under which this defendant is prosecuted provides that nothing in said act shall be construed so as to interfere in any manner with the individual's right to select and employ the practitioner or mode of treatment of his choice, or *to* interfere in any manner with the right of the person so employed to give the treatment so chosen. If you, therefore, find that A. H. Davis knew at the time he went to the defendant to secure medical service and attention that the defendant was not in fact a licensed doctor and that the said A. H. Davis had no intention of using and did not use said medicine, that in that case it is your duty to return a verdict of not guilty."

■ ■ If the contention of counsel for defendant is correct, subdivision 9 of Section 14, Chapter 452, practically repeals most of the essential features of the preceding section. It is very seldom that a practitioner thrusts himself upon a patient. The real *bona fide* practitioner usually waits until his services are called for; the quack or fraudulent practitioner induces patients to seek his services, either by open advertising or by other devious but often effective methods. And it is the latter class against whom the law is especially

directed. In construing the law we do not take detached sentences or sections, but take the statute by its four corners, the better to ascertain the intent of the lawmakers. By so examining this statute, the intent is clear, and, as we construe it, not in accord with defendant's contention. The exemptions are all reasonable. It would be unfair to a person who believed his disease could be cured by prayer to deprive him of the ministrations of those of his religion who were willing to try that means of curing him. It would be unfair to prevent a member of that large and respectable part of the community who believe, as do the Christian Scientists, that disease is a mental state primarily and can be cured or prevented by mental treatment and without the use of medicine, from calling in a Christian Science practitioner to treat him according to the practice of that body. And it was the intent of the statute to permit that sort of treatment without exposing the person so treating the patient to the penalties of the law. To do otherwise would come too close to interference with religious tenets to be safe or practicable. To avoid such interference was the intent of the subdivision quoted, and no more than this. The objection is not well taken.

We may add that the fact that Davis went to defendant in fact as a detective, and with no rash intent to drink the mixture prescribed, can make no difference: *People* v. *T. Wah Hing*, 47 Cal. App. 327 (190 Pac. 662).

This disposes of the contentions made in defendant's brief, and the judgment of the Circuit Court is affirmed. AFFIRMED.

RAND, BEAN and ROSSMAN, JJ., concur.