JOSEPH SWIGART

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa January 15, 1895.*

1. GAMING—*horse racing is a game, within the Criminal Code.* Horse racing is a game, within the meaning of section 127 of the Criminal Code, imposing a penalty upon the keeper of a common gaming house or place where persons are allowed to congregate to play at any game for money or other valuable thing.

2. SAME—*room used for book-making and pool-selling unlawful.* A place under the grand-stand at a driving park, used for the purpose of book-making and selling pools upon races at such park and elsewhere, is prohibited by section 127 of the Criminal Code, making the keeper of or one renting a common gaming house or place liable to fine and imprisonment.

3. SAME—*proviso of act of 1887 construed.* The proviso of the act of 1887 against book-making and pool-selling, that its provisions shall not apply to the actual enclosure of fair or race-track associations, confers no such right to carry on book-making and pool-selling within such enclosure as will relieve such associations or their officers from liability under section 127 of the Criminal Code.

4. STATUTES—*authorization of acts opposed to public policy not presumed.* It will not be presumed, in the absence of an expressed intent, that a statute legalizes acts, prohibited by public laws, which tend to the demoralization of the community or are opposed to the public policy of the State, as shown by its legislative acts.

*Swigart* v. *People,* 50 Ill. App. 181, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

KNIGHT & BROWN, and LYMAN TRUMBULL, for appellant:

Criminal statutes are to be strictly construed. General words following a specific enumeration only include such things as are enumerated. *Marquis* v. *Chicago,* 27 Ill. App. 251; *Shirk* v. *People,* 121 Ill. 61; *In re Swigert,* 119 id. 83; *State* v. *Bryant,* 90 Mo. 534; *People* v. *Goldman,* 1

Idaho, 714; *State* v. *Hayden*, 31 Mo. 35; *Huff* v. *Commonwealth*, 14 Gratt. 648; *Commonwealth* v. *Shelton*, 8 id. 592; *Harless* v. *United States*, 1 Morris, 225; *State* v. *Mosely*, 14 Ala. 390; *Norton* v. *State*, 15 Ark. 71; *State* v. *Harrison*, 15 id. 259.

Horse racing, and wagers thereon, are lawful at common law. *Harris* v. *White*, 81 N. Y. 539; *Kirkland* v. *Randon*, 8 Tex. 10; *Dewars* v. *Miller*, 5 Harr. 347; *James* v. *State*, 63 Md. 242.

Contesting for or offering a premium on a horse race is not gaming. *Wilson* v. *Conlin*, 3 Ill. App. 517; *Delier* v. *Agricultural Society*, 57 Iowa, 481; *Alvord* v. *Smith*, 38 Ind. 58; *Mullen* v. *Driving Park*, 64 id. 202; *Harris* v. *White*, 81 N. Y. 539.

Horse racing is not gaming and pool-selling is not gambling. *State* v. *Hayden*, 31 Mo. 35; *State* v. *Lemon*, 46 id. 375; *James* v. *State*, 63 Md. 242; *Harrison* v. *State*, 4 Cold. 195.

Making wagers on the result of the speed or endurance of horses has never been prohibited by statutes of this State prior to said act of 1887. The fact that the same has not been included, in plain language, in former statutes, as used in the act of 1887, shows that the legislature never before contemplated or intended any like prohibition as to pool-selling or horse racing. The proviso in the act of 1887 expressly exempts appellant from liability. *Brennan* v. *Racing Ass.* 63 N. Y. 188; *Winchester* v. *Nutter*, 52 N. H. 507.

ADOLPH KRAUS, and SIGMUND ZEISLER, for appellee :

Horse races have often been held games, within the meaning of the Statute of Anne, when made for wagers. *Goodburn* v. *Marley*, Strange, 1159; *Blaxton* v. *Pye*, 2 Wils. 309; *Grace* v. *McElroy*, 1 Allen, 563; *Tatman* v. *Strader*, 23 Ill. 493; *Mosher* v. *Griffin*, 51 id. 184; *Ellis* v. *Beale*, 18 Me. 337; *Cheesman* v. *State*, 8 Blackf. 332; *Wilkinson* v. *Towsley*, 16 Minn. 299; *McLain* v. *Huffman*, 30 Ark. 428,

So have been dog fights. (*Eagerton* v. *Furzeman,* 1 C. & P. 613.) And foot races. (*Lynall* v. *Longbotham,* 2 Wils. 36.) And cock fighting. *King* v. *Newell,* 3 Keb. 465 ; *Squires* v. *Whisken,* 3 Camp. 140 ; *Bagley* v. *State,* 1 Humph. 486 ; *Johnson* v. *State,* 4 Sneed, 614; *Commonwealth* v. *Tilton,* 8 Metc. 232.

Per CURIAM : Joseph Swigart was arrested upon a warrant charging him and others with keeping a common gaming house in a building, booth, yard, etc., by him or his agent used and occupied, and permitting persons to frequent and come together to play for money and other valuable things, and knowingly renting such place for such purpose. No objection is made that the complaint and warrant do not sufficiently charge the offenses enumerated in section 127 of the Criminal Code. On trial before the justice of the peace the defendant was found guilty and a fine of $100 imposed. An appeal was taken to the Criminal Court of Cook county, where a jury was waived and the cause submitted to the court. Hearing the testimony, the court again found the defendant guilty, and motion for a new trial having been overruled, he was sentenced to pay a fine of $100 and costs. The case having been taken to the Appellate Court, the judgment was there affirmed.

A sufficient statement of the facts is : The Garfield Park Club is an incorporated company. The object for which it was formed was shown to be, "to establish and maintain a driving park and race-track, where running, trotting and other meetings may be held to develop speed and endurance in thoroughbred horses ; and also to hold fairs and horse shows, fat-stock and other exhibitions, and entertainments of all kinds, at such driving park." The company rented a tract of land adjacent to the city of Chicago, and enclosed it with a fence ten or twelve feet high. Within this enclosure are a race-track, shed, engine house and electric light plant, a grand-stand, res-

taurants, etc. The club conducted horse races during the years 1891 and 1892, there being from five to seven races daily, excepting Sunday, at which an average of $3000 per day was paid out as prize-money on races. On Derby day there was a purse of $20,000. The prizes were all paid by the club. On Derby day the attendance was between 30,000 and 40,000, the average daily attendance being about 6000. Swigart was secretary of the racing department of the Garfield Park Club, and had charge of the races, in conjunction with others. A part of the revenue of the club was obtained from space and privileges rented to book-makers and pool-sellers, the average number of the former being about thirty a day. These parties had their places in what is called the "betting room," located under the grand-stand, and, it seems, paid for each stand $100 daily. The place where the betting was going on was covered, but was open on the sides, so that any one going into the grand-stand had free access to it. It was about one hundred feet long and seventy-five feet wide. The grand-stand encloses it on one side and the restaurant is at one end. On the east, underneath the grand-stand, it was open, and when parties were at the east side of where the book-making and pool-selling were going on they came in view of the horses on the track. This was sometimes called "the betting room" and sometimes "the betting ring." Book-making was there carried on, not only upon the events and races to be run on the Garfield Park track, but also upon races taking place or about to take place on other tracks. The races outside, upon which pools were sold and books made, were known as "foreign races." Pools were also sold upon races upon the Garfield Park track, and also upon races upon other race-tracks. No question is made of the defendant's liability for the acts committed, or of his guilt, if such acts are punishable under the section of the statute.

Section 127 of the Criminal Code (chap. 38) provides : "Whoever keeps a common gaming house, or in any building, booth, yard, garden, boat or float by him or his agent used and occupied, procures or permits any persons to frequent, or to come together to play for money or other valuable thing at any game, or keeps or suffers to be kept any tables or other apparatus for the purpose of playing at any game or sport for money or any other valuable thing, or knowingly rents any such place for such purposes, shall, upon conviction, for the first offense be fined not less than $100, and for the second offense be fined not less than $500 and be confined in the county jail not less than six months, and for the third offense shall be fined not less than $500 and be imprisoned in the penitentiary not less than two years nor more than five years."

That book-making and pool-selling are each betting upon the horse race or particular event upon which they are made or sold, is not questioned. In the first, the betting is with the book-makers; in the second, the betting is among the purchasers of the pool, they paying a commission to the seller. (See *James* v. *State*, 63 Md. 242, and *Commonwealth* v. *Simonds*, 79 Ky. 618, where the various methods of pool-selling are shown.) It is shown that in the part of the premises called the "betting room" or "betting ring" stands were leased to book-makers and pool-sellers, for the purpose of carrying on the business. It is shown that large numbers of persons were present and permitted to assemble within said room during the racing season and meetings of the association, who did bet upon the result of races taking place upon the track of the Garfield Park Club, and also upon other race tracks in and out of the State,—that is, that books were made and pools sold upon races run at Brighton Beach, in the State of New York, and at Guttenberg, in the State of New Jersey, and at other places. We do not understand counsel to insist that the place where this was permitted does not fall within the designation of

"place," in the section of the statute quoted.    It is, however, clear that it was a building and yard, within the contemplation of the section quoted.    The question submitted is thus stated by counsel for defendant :    "Do the acts shown make the officers and agents of the club guilty of keeping a common gaming house, or of procuring or permitting persons to frequent and come together to play for money or other valuable thing, or of knowingly renting for such purposes, within the meaning of the statute?"

It is said that, in construing penal statutes, general words, following a specific enumeration of objects or things which are prohibited, will be held to include only such things as are of the same kind as those specifically enumerated, and *Shirk* v. *People*, 121 Ill. 61, and other cases, are cited as sustaining the contention.    We recognize the rule contended for, but it can have no application to section 127, either considered by itself or when read in connection with section 126, which defines and prescribes the punishment for gambling.    Indeed, there is no enumeration of specific subjects or things in section 127 which necessitates or could suggest the application of the rule *ejusdem generis*.    Section 126 is as follows: "Whoever shall play for money or other valuable thing at any game with cards, dice, checks or at billiards, or with any other article, instrument or thing whatsoever which may be used for the purpose of playing or betting upon or winning or losing money or any other thing or article of value, or shall bet on any game others may be playing, shall be fined not exceeding $100 and not less than $10."    Here we find the enumeration of certain articles or things, as dice, cards, checks and billiards, that are necessarily wholly dissimilar in themselves and in the manner of their use, but all of which introduce the element of chance or hazard in determining the result of games played with them. The things or instruments enumerated are not of the same kind, and have nothing in common, either in themselves

or their use, except that they are each used in playing games, and money or other valuable thing may be wagered upon the result of such games. If, as contended, the rule required that the article or thing referred to in the general words of the section must be of the same kind as the articles and things specifically enumerated, it is apparent that gambling with many devices must be excluded. Under which description would the wheel of fortune, and similar devices, fall? Manifestly, under neither cards, dice, checks nor billiards. But, as before said, each of the modes of gambling specifically enumerated,—that is, with cards, dice, checks or at billiards,—has common ground of resemblance,—that is, the articles or things named may be used in gaming. The element of chance or hazard is, to a greater or less extent, introduced, and money may be won or lost as the result. The statute does not prohibit the playing of cards, dice, checks or billiards. The playing of games at either is entirely lawful, and it is only when they are made the instruments of winning or losing money or property that a criminal character attaches to their use. And it was this element in the use of cards, dice and billiards, and "any other article, instrument or thing," that the legislature had in contemplation and against which the enactment is directed, and it is this quality alone that designates the article or thing which must be held to be included within the general words of the section. The language is plain and unambiguous. It is not intended to prohibit games of cards, the running of horses or playing of billiards, but it is intended to, and does, prohibit every person from playing any game for money or other valuable thing at or with any article, instrument or thing whatsoever which may be used for the purpose of playing or betting upon, or which may be used for the purpose of losing or winning money or any article or thing of value.

It is, however, said, that horse racing is not a game, within the meaning of this statute, and we are referred

to cases in other States holding that it is not a game
within the meaning of the statutes of those States.
Whatever persuasive force these decisions may have, this
court is committed, by a long line of decisions, to the
position that horse racing is a game, within the meaning
of our statutes.   It can make no difference that those
cases arose upon statutes making contracts entered into
as the result of gaming, or in which the consideration
was for money, property or other valuable thing won by
gaming, void and of no effect.   Section 1 of chapter 46 of
the Revised Statutes of 1845, entitled "Gaming," provided
that all promises, etc., made, etc., where the whole or any
part of the consideration thereof was for money, prop-
erty or other valuable thing won by gaming, or playing
at cards, dice or any other game or games, or by betting
on the side or hand of any person gaming, etc., should be
void and of no effect.   Section 2 provided for the recov-
ery back of any money or other valuable thing lost upon
any such game, etc.   The case of *Tatman* v. *Strader*, 23
Ill. 493, arose under this statute, and was to recover
money of the plaintiff, won by the defendant, at a horse
race and paid over to him by the stakeholder.   The court
there said :   "The only question in this case is, whether
horse racing is gaming, within the provisions of our
statute.   The words of the statute are, 'won at any gam-
ing, or playing at cards, dice or other game or games.'"
And after reviewing various authorities the court held
that the language of the statute, "any game or games,"
expressly included athletic and other games of muscular
strife, as well as games of hazard and skill played with
instruments, and that horse racing was a game, within
the meaning of the statute.   We need not repeat the argu-
ment of that case.   To the same effect see *Garrison* v. *Mc-
Gregor*, 51 Ill. 473, *Mosher* v. *Griffin*, id. 184, and *Richardson*
v. *Kelly*, 85 id. 491.   In *Schaffner* v. *Pinchback*, 133 Ill. 410,
we said: "That betting money on horse racing is gaming,
and in violation of law, was decided in *Tatman* v. *Strader*,

23 Ill. 494; and that a contract in aid of the offense of gaming, which is prohibited by statute, is void and can not be recovered upon, was held in *Mosher* v. *Griffin*, 51 Ill. 184.   *   *   *   Plaintiff in error having embarked his money in an enterprise [*i. e.*, book-making at horse races,] prohibited alike by the statute, by good conscience and by public policy, placed himself and his money outside of the pale of the law."

Numerous decisions by the English courts are to be found in which the words "game or games," in the statute of 9 Anne, (chap. 14, sec. 1,) which declared all bets upon "game or games" void, included bets upon horse races and the like. (*Goodburn* v. *Morley*, Strange, 1159; *Blaxton* v. *Pye*, 2 Wils. 309; *Clayton* v. *Jennings*, 2 W. Black. 706.) And so dog fights have been held to be games, (*Eagerton* v. *Furzeman*, 1 C. & P. 613,) and foot races, (*Lynoll* v. *Long-botham*, 3 Wils. 36,) and cock fighting, (*King* v. *Newell*, 3 Keb. 465; *Squires* v. *Whisken*, 3 Camp. 140; *Bagley* v. *State*, 1 Humph. 484; *Johnson* v. *State*, 4 Sneed, 614; *Commonwealth* v. *Tilton*, 8 Metc. 232.) And in respect to horse races and the like in this country, see *Ellis* v. *Beale*, 18 Me. 337; *Grace* v. *McElroy*, 1 Allen, 563; *Cheesman* v. *State*, 8 Blackf. 332; *Wilkinson* v. *Towsley*, 16 Minn. 299; *McLain* v. *Huffman*, 30 Ark. 428.

In *People* v. *Weithoff*, 51 Mich. 203, the defendant was convicted of the unlawful keeping of a gaming room, contrary to the provisions of the statute. The information charged that the defendant did keep and maintain a gaming room, and in said room carry on the business of pool-selling on horse races, etc., and upon base ball games, etc. On the trial it was admitted that the defendant, at the time charged, etc., did keep a room for the sale of pools, etc., upon horse races and games of base ball, as described in the information. It was decided that the room so kept was a gaming room, within the meaning of the statute. The defendant was found guilty and the judgment was affirmed in the Supreme Court, the

question there being, as stated by the court, "whether the use of the room for this purpose makes it a gaming room, within the meaning of the statute." The statute provided (Rev. Stat. sec. 15, chap. 43): "Any person who shall, for hire, gain or reward, keep or maintain a gaming room, * * * or who shall suffer a gaming room * * * to be kept and maintained * * * on any premises occupied or controlled by him, shall be deemed guilty of a misdemeanor," etc. That court, by COOLEY, J., in an able opinion, in which the authorities are collated and reviewed, held that pool-selling upon horse racing and base ball games is gaming, within that statute.

It is insisted that the decisions in this State were in civil cases, and that the same rule of construction can not be adopted in the construction of a criminal statute. In the passage of each of these statutes the legislature had in view the immorality of the act and the evils resulting. In the one case the party playing the game was to be punished by the infliction of a fine ; in the other he was not to be permitted to reap the fruits of his immoral practice. The statutes were upon the same general subject, and it must be conceded that a party could no more be deprived of his property in a civil suit, unless the act was unlawful, than he could be convicted under the Criminal Code without his act being unlawful. Mere betting on an uncertain or contingent event was not unlawful at common law, and has not been declared so by statute. The statute construed in the Illinois cases did not assume to make all contracts void the basis of which was a bet or betting, but affected contracts when the consideration thereof was money won at gaming, or by playing at a game or games, etc. It can scarcely be contended that the legislature used the terms "game or games," and "gaming," in a different sense in the one statute from that in which they intended to employ them in the other statute. In section 126 the playing of the game for money, etc., subjected the offender to a pecuniary

penalty of not less than $10 nor more than $100. The sections construed subjected him to a loss of all his winnings, either by declaring the contracts therefor void, or compelling him to restore what he had won and received.

It is clear, therefore, that the room or space within the grand-stand, within the enclosure of said Garfield Park Club, kept and used, as we have seen, for the purpose of book-making and selling of pools contingent upon the result of horse races, the seller or buyer of the pools winning the money wagered upon the race or losing it, was a common gaming house, within the meaning of the statute.

But it is contended by counsel for appellant, that by virtue of the provisions of the act of the legislature of 1887, entitled "An act to prohibit book-making and pool-selling," the conduct of the Garfield Park Club in permitting the sales of pools and making of books within its enclosure was not unlawful, and that appellant, therefore, was not guilty of the offense charged. That act provides: "That any person who keeps any room, shed, tenement, tent, booth or building, or any part thereof, or who occupies any place, upon any public or private grounds within this State, with any book, instrument or device for the purpose of recording or registering bets or wagers or of selling pools, or any person who records or registers bets or wagers or sells pools upon the result of any trial or contest of skill, speed or power of endurance of man or beast, or upon the result of any political nomination, appointment or election, or, being the owner, lessee or occupant of any room, shed, tenement, tent, booth or building, or any part thereof, knowingly permits the same to be used or occupied for any of these purposes, or therein keeps, exhibits or employs any device or apparatus for the purpose of recording or registering such bets or wagers or selling of such pools, or becomes the custodian or depository, for hire or privilege, of any money, property or thing of value staked,

wagered or pledged upon any such result, shall be punished by imprisonment in the county jail for a period not longer than one year, or by a fine not exceeding $2000, or both: *Provided, however,* that the provisions of this act shall not apply to the actual enclosure of fair or race-track associations that are incorporated under the laws of this State, during the actual time of the meetings of said association, or within twenty-four hours before any such meetings."

It is strenuously contended that the effect of this statute was to repeal, by implication, section 127 above quoted, so far as it relates to gambling by book-making and pool-selling. It is apparent that by the later act the legislature intended to affix a different penalty for the keeping of rooms, etc., with books, instruments or devices for the purpose of registering bets or wagers or of selling pools upon the result of trials of contests of skill, speed or power of endurance of man or beast, or upon the result of nominations, appointments or elections, or, being the owner, lessee or occupant of any such room or building, to knowingly permit the same to be used for such purpose, or therein to keep, exhibit or employ any apparatus or device for the purpose of registering bets or wagers or selling pools, or to become the stakeholder of the things wagered, etc., than is prescribed for other offenses falling within the purview of section 127, before quoted. For the acts prohibited by this statute of 1887, the penalties imposed would necessarily be under it, if it be otherwise valid. The validity of the act, exclusive of the proviso thereto attached, is not questioned. The act of 1887 is less broad and comprehensive than the section of the Criminal Code under consideration, and, under the well-recognized canons for construing criminal statutes, would be held necessarily to include and prohibit the acts and conduct enumerated in it. Section 127 is directed against every house, etc., where persons are procured or permitted to come together to

play for money or any valuable thing at any game or games. The offenses denounced, to a great extent, consist in the public demoralization, from the fact that persons frequent and come together for the purposes of gambling. At common law, gambling, in and of itself, was not a nuisance, but became so when accompanied with incidents tending to the discomfort, disorder or demoralization of society. (Wharton on Crim. Law, 1465 b.) That drawing together of large numbers of persons, from all classes of society, in and about the betting rooms and betting rings of the Garfield Park Club, so that they were brought into familiarity with gambling in its various forms as there practiced, was demoralizing, can admit of no question; and that the keeping of the places where persons were procured or permitted to assemble together for the purpose of betting, and winning and losing money, falls within both the letter and spirit of section 127 of the Criminal Code, admits of no controversy. The act of 1887 is directed against the particular act of the person charged, and cannot be broadened in its scope to include other and different offenses denounced by the section of the Criminal Code now under consideration.

Repeals by implication are not favored, and an earlier statute will not be held to be repealed by a subsequent act of the legislature unless the two acts be so repugnant and inconsistent that they may not subsist together, or there is a plain intention indicated to repeal the former statute, and they should be so construed as that both may be given effect, if it can consistently be done. *Holton* v. *Daly*, 106 Ill. 131; *Ottawa* v. *LaSalle County*, 12 id. 339.

It may be conceded, that as to the specific offenses enumerated in the act of 1887 that act is in force and affixes the penalty to be imposed for its infraction, and the 127th section of the Criminal Code, in other respects, and as affecting the procuring and permitting of persons to come together for the purpose of betting, winning and

losing money, remains in full force. It only remains, therefore, to consider the effect of the proviso to the act of 1887.

The contention that some right was conferred by the proviso to sell pools and make books within the enclosure of the fair grounds or race-track of the association can not be sustained. The language of the proviso is negative, and is, that the provisions of the act shall not apply to the actual enclosure of fair or race-track associations that are incorporated under the laws of this State, during the actual meetings of the associations or for twenty-four hours prior thereto. In *City of Chicago* v. *Brownell*, 146 Ill. 64, an ordinance of the city of Chicago in the precise language of the act of 1887, except as to the penalty imposed, was before this court for consideration, and it was there said that the proviso "in no sense authorizes or sanctions book-making or pool-selling in the excepted places at the times mentioned, but simply makes no provision for the punishment of those who may do the acts within those enclosures at such times." See cases there cited.

The effect of the proviso, under the most favorable construction for appellant that is possible, would be to relieve the doing of the acts enumerated in this statute from the penalty there imposed, and, without in any sense sanctioning or rendering lawful acts which were otherwise unlawful, relieve them from the penalties imposed by this act when committed at the times and places designated in the proviso. It is just as consistent with the proviso that the legislature intended, because of the increased harm to the community at large on account of the presumed assembling of large numbers of people within the enclosures of fair grounds and race-track associations during the meetings thereof, that pool-selling and book-making, and exhibiting the appliances and devices thereof and becoming stakeholders of money wagered, should be punished under the general statutes of the State in force,

as it is to presume that they intended to throw wide open this species of gambling at such public assemblages. It is noticeable that the evil sought to be remedied by the statute under consideration is the calling together and assembling of persons for the purposes of gambling, and while the penalty imposed for the first and second offenses is lighter than that which may be imposed under the act of 1887, for the third and subsequent offenses it becomes a felony, punishable by imprisonment in the penitentiary for a term of not less than two nor more than five years. As already seen, gambling, when so conducted as to tend to debauch the public morals, was an offense at common law. The statute against private gambling imposes a penalty by a fine of not less than $10 nor more than $100, only, while, as we have seen, the causing to be assembled for the purposes of gambling is made a felony, unless the lighter penalties imposed for the first and second offenses shall be sufficient to protect society from the evil.

But we need not pursue this branch of the inquiry, for it will not be presumed, in the absence of all expressed intent, that the legislature intended to authorize or make lawful acts prohibited by the public laws of the State which tend to the demoralization of the community or are opposed to the public policy of the State, as shown by its legislative enactments.

It is urged that the purpose in enacting the proviso was to encourage and promote the development of horses, and perhaps other stock, by creating an interest in the trials of speed and endurance of such animals. Without now pausing to determine the effect upon the act, under the constitution, if construed as contended for by appellant, as prohibiting the granting of special privileges to any corporation, it may be said, that if the purpose of the legislature were as suggested, it can not be held that it was intended to authorize the acts here shown to have been. committed by appellant and his associates. It is shown that the book-making and pool-selling related not

only to events occurring within the enclosure of the Gar-
field Park Club, but to races at Brighton Beach, Mon-
mouth, Gloucester, Guttenberg, Gravesend, Morris Park,
Sheep's-head Bay, and other places in and out of the
State of Illinois.  If it could be conceded that the legis-
lature intended to legalize pool-selling and book-mak-
ing at fairs and the meetings of race-track associations
because of its tendency to develop and improve horses, it
can not be presumed that it was intended to authorize
mere betting on events which could not have produced,
or even tended to produce, such results.  It is impossible
to conceive that it could be within the contemplation of
the legislature that betting, in Chicago, upon the result
of trials of speed in England or Australia could tend to
improve the stock of this State; and it must be held,
even if it could be conceded that it was the intention of
the legislature to authorize pool-selling and book-making
upon events occurring within the enclosure of the Gar-
field Park Club, that it was not within the contempla-
tion of the legislature to authorize gambling upon events
occurring elsewhere.  It can no more be said that betting
upon what is designated in the record as "foreign races"
would be authorized under the construction of the statute
contended for, than would the selling of pools or making
of books upon the result of a prize fight in New Orleans,
a bull fight, or cock fight, or game of base-ball.  Such
construction must be placed upon the proviso as will sus-
tain it, and render it a valid enactment under the consti-
tution of the State, if it can reasonably be done.

In view of what has been said, we do not deem it neces-
sary in this case to determine the point made, that the
construction of the act contended for by appellant would
render it violative of section 4, article 13, or of the 22d
section of article 4, of the constitution of the State.  By
the act of 1887, if the proviso be regarded as in full force
and effect, the acts therein specifically mentioned are

excepted out of the operation of that act when committed or done at the designated places,—that is, that act, as to such acts, is inoperative. But it by no means follows that there is any suspension of the 127th section of the Criminal Code, so far as it relates to the keeping or maintenance of a building, booth or room, etc., where persons are procured or permitted to come together to wager money or other valuable things upon any game or games. It may well be that the party could not be prosecuted for doing the acts prohibited by the act of 1887, at the times and places mentioned in the proviso, and yet the substantive offense denounced by the section of the Criminal Code under consideration be committed. If pools may be sold, books made, devices for registering bets exhibited, without causing or procuring persons to assemble together for the purpose of wagering or betting upon games, etc., it may be that the proviso would, at the times and places indicated, prevent prosecution under the act of 1887,—which, however, we do not decide. But if so conducted as that the provisions of section 127 are violated, there is nothing in the proviso to prevent prosecutions under that section. That the selling of pools and making of books privately, and so as not to affect the public, would lessen the value of the privilege, if it existed, furnishes no reason for the violation of the criminal laws.

The evidence shows the defendant guilty of violating the provisions of section 127 of the Criminal Code, and the conviction was therefore proper, and must be sustained. The judgment will be affirmed.

*Judgment affirmed.*