Argued February 9; reversed and remanded March 4, 1949

# CITY OF PORTLAND *v.* DUNTLEY
### 203 P. (2d) 640

366

*Virgil H. Langtry,* of Portland, argued the cause for appellant. With him on the brief were Alexander G. Brown, Philip J. Roth and John F. Reynolds, of Portland.

*Edwin D. Hicks and Thomas H. Tongue III,* of Portland, argued the cause for respondent. On the brief were Hicks, Davis & Tongue, of Portland, and Ralph E. Moody, of Salem.

Before Lusk, Chief Justice, and Brand, Belt, Ross-man, Kelly and Bailey, Justices.

## LUSK, C. J.

On this appeal the validity of an ordinance of the City of Portland, denouncing as unlawful bookmaking establishments, selling pools, and gambling upon animal races, is drawn in question as in conflict with state law. The action was commenced in the Municipal Court for the City of Portland by the filing of a complaint charging the defendant with violation of the ordinance by conducting a bookmaking establishment upon horse races. The defendant filed a demurrer to the complaint, which the court sustained, and the action was dismissed. The City appealed to the Circuit Court for Multnomah County, where the case was heard by a bench of three judges upon a stipulation that the sole question to be presented "was whether said ordinance is void or unconstitutional as in conflict with the provisions and spirit of the Oregon State Racing Act, section 91-901 ff., O. C. L. A., and with

the public policy of the State of Oregon established thereby''. The court rendered an opinion holding the ordinance void, and entered an order affirming the judgment of the municipal court and dismissing the appeal. From that order the City has taken this appeal as authorized by Ch. 462, Oregon Laws, 1947.

The ordinance in question (§ 16-1122 of the Police Code of the City of Portland, Ordinance No. 76339, passed December 4, 1941) is as follows:

## "POOL SELLING AND BOOKMAKING

"It shall be unlawful for any person to conduct any bookmaking establishment, or to sell pools or tickets, or to gamble in any manner whatsoever, upon animal races, conducted either within or without the corporate limits of the City of Portland. This section shall not apply to pari-mutuel betting taking place at the track or at racing meets conducted under the supervision of the Oregon Racing Commission.''

The complaint charges violation of the ordinance in these words:

"The above named defendant on April 13, 1948, within the corporate limits of the said City of Portland did wilfully and unlawfully at the Santa Anita Turf Exchange Club, 429 S. W. Park Avenue, conduct a bookmaking establishment upon animal races, to-wit, horse races, conducted without the corporate limits of the City of Portland; that said bookmaking establishment did not, at said time and place, conduct parimutuel betting at the track or at racing meets conducted under the supervision of the Oregon Racing Commission.''

■ The demurrer filed by the defendant was based upon grounds both that the ordinance is invalid and that the complaint does not state facts sufficient to constitute a violation of the ordinance. We are met

at the outset with the contention that the judgment should be affirmed on the latter ground alone. It is said that the complaint is wholly insufficient because it charges the offense only in the words of the statute, that if the court were to decide the question of the validity of the ordinance under these circumstances it would be acting in a vacuum and in effect pronouncing a declaratory judgment; and, finally, the familiar rule is invoked that a court will not pass upon a constitutional question if there is present any other ground upon which the case can be decided.

This contention comes strangely from the defendant. He stipulated with the City that the only question to be determined by the Circuit Court was that of the validity of the ordinance. It seems to be thought that it was entirely right for the Circuit Court to act in a vacuum, to issue a declaratory judgment, and to decide a constitutional question although there were other grounds of decision available; but that for this court to pursue the like course would be improper. It is not unusual for a party seeking to sustain legislation to remind courts of their reluctance to decide constitutional questions when it is possible to avoid doing so. But this is the first case that has come to our attention where a party who has raised a constitutional question has admonished a court not to decide it.

*State v. Morano,* 133 N. J. L. 428, 44 Atl. (2d) 786 (opinion of the Supreme Court), 134 N. J. L. 295, 47 Atl. (2d) 419 (opinion of the Court of Errors and Appeals), is a well considered decision sustaining an indictment which charged the offense of bookmaking in the language of the statute. What this court said in *State v. Wye,* 123 Or. 595, 600, 263 P. 60, is in har-

mony with the New Jersey courts' views. We do not decide the question, however, because we are satisfied that to do so would be beyond the jurisdiction conferred upon this court in this special class of appeals.

■■ Except for that limited class of cases in which the Supreme Court exercises original jurisdiction, this is an appellate court deriving its jurisdiction from the statutes. They are the sole source of appellate jurisdiction. The statute under which this appeal was prosecuted (Ch. 462, Oregon Laws, 1947) provides that where the validity of a charter or ordinance provision of a city or town comes in issue in a trial for violation of such charter or ordinance provision the trial judge shall determine such question of validity before making a decision as to the facts. From an order of the Municipal Court declaring such charter or ordinance provision invalid the city may appeal to the Circuit Court of the county in which such city is located, and from such order by a Circuit Court the city may appeal to the Supreme Court. "Upon the order of the appellate court *upon such issue* the case shall be remanded with direction." (Italics added.) It is plain from these provisions that the only matter which either this court or the Circuit Court is authorized to consider and determine on an appeal under this statute is "such issue" —i. e., the issue of the validity of the charter or ordinance provision. The statute is the measure of our power and duty. The defendant's rights, if any, under his demurrer are not lost if the ordinance is declared valid, but may be determined upon the remand.

■ We pass, therefore, to the question of the validity of the ordinance. The contention here on behalf of the defendant is that the Oregon State Racing Act, passed by the legislature in 1933 (Oregon Laws 1933, Ch. 397),

now with subsequent amendments found in §§ 91-901 et seq., O. C. L. A., has legalized bookmaking on horse races when conducted away from the race track and pursuant to what is commonly known as the pari mutuel system. Before examining the provisions of the statute it will simplify the issue to note that the defendant in his brief concedes that bookmaking is a form of gambling; that the Portland Charter, § 2-105 (a) 49, purports to authorize the City Council "to prevent and suppress gaming and gambling houses", and that the City may, therefore, prohibit all forms of gambling not legalized by state law. Nor is it disputed that prior to the effective date of the Racing Act bookmaking was an offense against the law of the state, not because it was a violation of any statute specifically denouncing bookmaking or betting on horse races, but because it constituted a public nuisance within the embrace of the so-called Nuisance Statute (§ 23-927, O. C. L. A.). See *Multnomah County Fair Association v. Langley,* 140 Or. 172, 13 P. (2d) 354; *State v. Ayers,* 49 Or. 61, 88 P. 653, 124 Am. St. Rep. 1036, 10 L. R. A. (N. S.) 992; *State v. Nease,* 46 Or. 433, 80 P. 897. On the other hand, the City does not take issue with the rule that "the power of the legislature to enact a general law applicable alike to all cities is paramount and supreme over any conflicting charter provision or ordinance of any municipality, city or town". *City of Portland v. Welch,* 154 Or. 286, 295, 59 P. (2d) 228, 106 A. L. R. 1188, and cases cited.

So, the ultimate question is whether the State Racing Act has so far repealed the Nuisance Statute or so far changed the policy of the State with respect to gambling on horse races as to bring the Portland ordinance into conflict with the Nuisance Statute and the

supposed new policy. The State Racing Act was passed with the following title:

"AN ACT

"Relating to, providing for and authorizing and regulating thoroughbred horse and animal racing; creating the Oregon racing commission; defining its powers and duties, and fixing compensation thereof; prescribing the manner in which race meets may be conducted; providing for mutual wagering; *prohibiting pool selling, bookmaking, and circulation of handbooks;* providing for issuance of licenses and fees to be charged; providing for the distribution of revenue; providing the penalties for violation of the act and declaring an emergency." (Oregon Laws 1933, p. 672. Italics added.)

In the following analysis of the provisions of the Act we shall refer to the sections of O. C. L. A. There have been amendments since the publication of that compilation, but none of them affect the present question. The Act provides for the creation of a racing commission (§ 91-902), charged with the duty "to prepare and promulgate a complete set of rules and regulations to govern the race meets in this state", under licenses to be issued by the commission (§ 91-904). " 'A race meet' shall mean and include any exhibition of thoroughbred and standard-bred horse racing, or other animal racing, where the mutual system is used" (§ 91-901). "No person who has been convicted of any crime involving moral turpitude, who has been found guilty by the commission of violating any of the provisions of this act, any rules and regulations of the commission, or who has failed to pay any of the sums required under this act, shall be issued a license" (§ 91-906). Provision is made for the payment to the commission of a percentage of the gross

receipts of mutuel wagering at race meets (id.) and for the distribution of the monies so received (above the amount retained for payment of the commission's expenses) to the state for the benefit of the various named agencies and associations, such as the State Fair, the Pacific International Livestock Exposition, the Pendleton Round-up and the various counties for their county fairs (§ 91-907).

Section 91-906 contains this provision:

" * * * provided, that any licensed race meeting conducted within a county containing a population in excess of two hundred thousand (200,000) shall pay three (3) per cent of the gross receipts of the mutuel wagering *at any such race-meet*". (Italics added.)

The same section provides that in counties having a population less than 200,000 the license fee shall be in addition to other sums "three (3) per cent of the gross receipts of the. mutuel wagering *at any such race-meet*". (Italics added.)

Section 91-908 provides:

"For the purpose of encouraging the breeding, within the state, of valuable thoroughbred race horses, at least one race of each day's meet shall consist exclusively of Oregon bred horses."

Section 91-910 provides:

"It shall be unlawful to conduct pool selling, book-making, or to circulate handbooks, or to bet or wager on any licensed race-meet, other than by the mutuel method, or for any licensee to take more than twelve and one-half (12½) per cent of the gross receipts of any mutuel wagering system; or for any licensee to compute breaks in the mutuel system otherwise than at five (5) cents; if during any race-meet conducted under this law there shall be an underpayment of the amount actually due to any wagerer, the amount of such underpayment

shall revert and belong to the state and be paid to the Oregon racing commission and become a part of its fund and shall not be retained by the licensee under whose license such race is held. * * * Every race-meet held in this state contrary to the provisions of this act hereby is declared to be a public nuisance and may summarily be abated.''

■ The words bookmaker and bookmaking are terms of common understanding, as is shown by copious references to dictionary and judicial definitions in the opinion of the New Jersey Court of Errors and Appeals in *State v. Morano,* supra. We refer to some of these definitions. '' 'Bookmaking' is 'a species of betting on races;' the 'business of receiving and accepting bets or wagers on the result of races, usually after quoting odds to prospective betters and having them write out slips;' it 'imports some method of recording bets.' '' 27 C. J., Gaming, 979, § 60; 38 C. J. S., Gaming, 54, 56, § 1. Book is defined in the old Century Dictionary and Cyclopedia: ''In betting, an arrangement of bets recorded in a book; a list of bets made against a specific result in a contest of any kind; as to make a book.'' A bookmaker is ''A professional betting man, especially one connected with the turf.'' Funk & Wagnall's Practical Standard Dictionary, published in 1933. See *Spies v. Rosenstock,* 87 Md. 14, 15, 39 Atl. 268. In *Swigart v. People,* 154 Ill. 284, 288, 40 N. E. 432, it is said: '' * * * bookmaking and pool-selling are each betting upon the horse race or particular event * * * In the first, the betting is with the book-makers; in the second, the betting is among the purchasers of the pool''.

■ The wagering system termed in the statute ''mutual'' or ''mutuel'' is what is commonly known as the ''pari mutuel'' system, under which ''odds''

are determined by the quantum of the bets placed on the several entries and those whose wagers are placed on the winning horse share the total stake, less a fixed percentage to the track management, in proportion to their respective contributions or wagers. *State v. Morano*, supra, 134 N. J. L. 298. It is a species of pool selling. In this opinion we shall refer to it as the pari mutuel system.

The essence of the argument for the defendant is that the legislature has authorized bookmaking, pool selling, and betting and wagering under the pari mutuel system "on race meets" in Oregon without any limitation as to place, and that the City, therefore, is without power to prohibit these activities at other places than the race track. The law, it is said, does not speak of bookmaking, etc., *at* race meets but *on* race meets. A deliberate decision of the legislature not to confine pari mutuel betting to the race track is sought to be deduced from the legislative history of the Act. It appears that on January 31, 1933, House Bill No. 362, being "A BILL For an act creating the state racing commission", etc., was introduced by five members of the House of Representatives. It was read a first and second time and referred to the Committee on Judiciary. The bill was printed. There is no record that the Committee on Judiciary took any action with respect to it, and on February 24, 1933, House Bill No. 541 was introduced by the original sponsors in conjunction with three other members of the House and three senators, and became, with some amendments, the State Racing Act. Section 7 of House Bill No. 362, the original measure, contained this provision:

"Any licensee conducting a racing meet, as provided herein, may provide a place or places

within the racing meet grounds at which it may conduct or supervise a pari mutual system of wagering by patrons on the horse races conducted by said licensee."

By § 9 of that bill it was made a misdemeanor to wager on a horse race in a manner not provided in the Act. It is argued that, since the Act which was passed contained no such provision as those just mentioned, it must necessarily be concluded that the legislature did not intend to confine wagering to "the racing meet grounds".

The defendant seeks additional support for his position by a contention that the public policy of the state has been changed with reference to gambling on horse races—not merely in so far as such gambling has been sanctioned when conducted by the mutuel method under the supervision of licensees of the State Racing Commission, who are required to pay a percentage of the receipts to the commission for the benefit of the designated donees of the State—but to the extent that commercial gambling, including bookmaking, is now approved. The argument, as we understand it, is to the following effect: The conducting of a bookmaking establishment has been declared to be unlawful because it is a public nuisance, and it is a public nuisance only because, as this court said in *State v. Nease*, supra (46 Or. 441), it tends "to draw together disorderly persons, and to encourage vice, idleness, and breaches of the peace". But licensed race meets, where wagering is permitted, also draw together disorderly persons and encourage vice, idleness and breaches of the peace, even in larger measure, since such race meets attract a far greater number of such disorderly persons than a small and perhaps

obscure bookmaking establishment. Therefore, it is concluded, in the language of the Circuit Court's opinion, that "the Racing Act provides a further exception to the general nuisance statute as to all pool selling, bookmaking, etc., conducted upon races where the pari-mutuel system of betting is used, and the odds fixed, and upon which payments to the winners are based, are the final odds fixed at the track, and that such activities, whether conducted at or away from the track, can no longer be deemed public nuisances and a crime under state law." And again:

> "Inasmuch as there seems to be a field of pool selling, bookmaking, etc., which is no longer unlawful under state law, and which the state itself has not attempted to license, regulate, or prohibit, it would appear that the city of Portland, in the exercise of its general police power, would have the right to license, tax, regulate, or suppress the same."

This court is unable to yield its assent to any of the foregoing propositions.

■■ The Racing Act established a system of state-controlled-and-regulated horse racing upon which pari mutuel betting is permitted. ("Other animal racing", which judicially we know is dog racing, is also authorized, but the present discussion may be confined to horse racing.) The only avowed purpose of the Act is that stated in § 91-908, "of encouraging the breeding, within the state, of valuable thoroughbred race horses", a purpose which we apprehend the legislature · hardly thought would be forwarded by legalizing commercial gambling. Other objects are apparent. One was to satisfy the desires of that not inconsiderable portion of the populace which delights to watch and to bet on horse races. Another was to provide revenue

for state and county fairs and other shows and exhibitions named in the Act. It is a matter of common knowledge that horse racing without betting will never be a successful or profitable enterprise on a large scale. But it is not to be supposed that the legislature deemed betting away from the track or under the auspices of professional gamblers essential to such success. And it is beyond question that the legislature intended that out of every dollar wagered, after deducting the amount which the licensee conducting the race meet is permitted to retain, a percentage fixed by the statute should be paid to the Racing Commission.

With this brief summary of the general scope and purposes of the Act we turn to the particular provisions regarding betting. It should first be observed that it is only by implication, although clear implication it must be said, that we can find any authorization of betting at all. It first appears in the words "where the mutual system is used" in the definition of a race meet in § 91-901. It appears again in the provisions of § 91-906 regarding the payment by a licensee to the commission of three per cent of the gross receipts of the pari mutuel wagering. It appears in § 91-910, not in the form of an express authorization but as a limitation. The section declares what "shall be unlawful". When the legislature said that it shall be unlawful "to bet or wager on any licensed race meet, other than by the mutuel method", it made no express provision and indicated definitely no intention as to the place where such betting might be conducted. The language of that phrase is not happily chosen, for one does not bet on a race meet, but one bets on the horses or on the races. That, of course, is what the provision

means, and, even though there were no other compelling reasons for so determining, a court might well say, in view of the general purpose of the statute, that the clause now under discussion discloses no clear intention to permit betting away from the race track.

There is, however, in other sections what seems to us to be conclusive evidence that there was no such intention. The very definition of a race meet as an exhibition of horse racing "where the mutual system is used" indicates that the pari mutuel system is to be used at the race meet and not at some other place. Section 91-906 speaks twice of the payment by a licensee to the commission of three per cent "of the gross receipts of the mutuel wagering *at* any such race-meet". If the pari mutuel system were operated, whether by a licensee or by a person commonly known as a bookmaker, in downtown Portland, instead of at the race meet, the Racing Commission would get no part of the receipts, and thus one of the main purposes of the Act would be frustrated.

■ It is a rule of statutory interpretation, having paramount importance, that courts seek legislative intent from the whole of the statute and not from isolated words and phrases, divorced from their context, and from the spirit and purpose of the enactment. See *State ex rel Peterson v. Woodruff*, 179 Or. 640, 647, 173 P. (2d) 961; *State v. Lee Chue*, 130 Or. 99, 109, 279 P. 285; 38 C. J. S., Gaming, 75, § 2 b. To decide this case in accordance with the defendant's contention, simply and solely upon a consideration of § 91-910 of the Act and the use of the word "on" instead of "at" in the phrase "or to bet or wager on any licensed race-meet" would be to ignore that rule, and also, we think, the legislative intent.

■ We come to the legislative history so much relied on by the defendant. There can be no doubt that the history of a measure during its enactment may be resorted to as an aid to interpretation where language of doubtful import is found in the statute. 50 Am. Jur., Statutes, 322, § 329; Horack's Sutherland Statutory Construction (3d ed.) 484, § 5003; *Fink v. Shepard Steamship Co.,* 183 Or. 373, 192 P. (2d) 258; *Hust v. Moore-McCormack Lines,* 328 U. S. 707, 90 L. ed. 1534, 66 S. Ct. 1218, reversing 176 Or. 662, 158 P. (2d) 275. See dissenting opinion of Mr. Justice Frankfurter in *Commissioner of Internal Revenue v. Estate of Francois L. Church,* 335 U. S. 632, and list of decisions in Appendix A thereto entitled "Decisions during the past decade in which legislative history was decisive of construction of a particular statutory provision." As illustrating the application of the rule, this court in the Fink case considered the reports of congressional committees, and gave weight, among other things, to the fact that the committees had, on the advice of the Attorney General, omitted from a proposed bill a provision which it had been requested to incorporate in it and had submitted to the Congress formal reports of their action. Other illustrations are recited in the defendant's brief, such as *Atlantic Coast Line R. R. Co. v. United States,* 66 Court of Claims 78, 393, where a bill had been reported to the House committee containing a provision exempting certain associations from a tax which was stricken from the bill by amendment. The court thought this elimination very persuasive evidence that such associations were not intended to be exempted. A similar case is *United States v. Pfitsch,* 256 U. S. 547, 65 L. ed. 1084, 41 S. Ct. 569, where the change in a bill was agreed upon by a conference committee after consideration and argument and was

formally reported to the Congress. "It is plain then", said Mr. Justice Brandeis, who wrote the opinion for the court, "that Congress had this question presented to its attention in a most precise form."

There are limitations, however, on the rule of aid to interpretation by legislative history. It is said in Sutherland, op. cit., 506, § 5015:

" * * * Generally the rejection of an amendment indicates that the legislature does not intend the bill to include the provisions embodied in the rejected amendment. However, such rejection may occur because the bill in substance already includes those provisions. Other interpretive aids may indicate that this is the case.

"Adoption of an amendment is evidence that the legislature intends to change the provisions of the original bill. Again, however, the amendment may have been adopted only because it better expressed a provision already embodied in the original bill. Thus caution must be exercised in using the action of the legislature on proposed amendments as an interpretive aid. Other interpretive aids should be considered in order to determine the legislative intent."

In *United States v. Allen,* 179 Fed. 13, 19, the Circuit Court of Appeals for the 8th Circuit held that it could not consider as an aid to interpretation the failure of Congress to enact a statute brought to the attention of the committee having the act under consideration in charge. The court said:

" * * * Courts can find the intent of the Legislature only in the acts which are in fact passed, and not in those which are never voted upon in Congress, but which are simply proposed in committee. It is not contended that the bill referred to was ever brought to a vote in Congress and rejected. It was simply one of the measures which

was under consideration at the time the act of May 27, 1908, was passed. To hold that such facts can be looked to for the purpose of narrowing the effect of a statute actually passed, would be to invent a new and dangerous canon of statutory interpretation.''

Whatever may be the limitations on the rule under discussion, we are satisfied that little if any light is thrown upon the legislative intent by the history of the Act under consideration. House Bill No. 362, the original bill, was never considered by either house of the legislative assembly nor by any committee. It was simply introduced, read twice, referred to a committee, and thereafter abandoned. It was apparently hastily drawn and inadequate. It contains about one-third the number of words that are in the bill that was passed. The latter was an entirely new bill in which some of the provisions of the original bill appeared in different language, many important substantive changes were made, and an abundance of new provisions were adopted.

Among these new provisions were the definition of a race meet, the requirement that licensees pay to the commission a percentage of the gross receipts of the pari mutuel betting *at race meets,* and the first clause of § 91-910 making wagering on races other than by the pari mutuel system unlawful. In view of these facts, we find no persuasive evidence, indeed no evidence at all, in the abandonment of the original bill and the adoption of the new, of an intention to authorize wagering away from the race tracks. We think, moreover, that the opposite intent is quite as effectively expressed in the bill that was passed as in the bill that was cast aside.

■ As to the claim that this legislation has resulted in the inauguration of a new public policy in this state with respect to commercial gambling, there is little that need be said. It is the function of courts to ascertain public policy from valid laws passed by the legislature. It is not their function to create public policy. *State v. Fallas,* 180 Or. 232, 239, 177 P. (2d) 254, 170 A. L. R. 729. If the legislature chooses to make lawful pari mutuel wagering on horse races at a race track, or, for that matter, away from a race track, when conducted by licensees under the supervision of a duly constituted agency of the State, it is not for a court to say that unsupervised gambling engaged in as a business by irresponsible persons is no more deleterious or injurious to the public morals than such regulated gambling, and by that process of rationalization to conclude that it is now the policy of the State to permit the bookmaker to ply his trade free from fear of the law. While citation of authority would seem to be unnecessary, the following language from the opinion in *Pari-Mutuel Messenger Service, Inc. v. Department of State,* 22 N. Y. S. (2d) 164, 168, 174 Misc. 902, is so apposite that we think it worth quoting:

" * * * The legislature in carefully prescribing and thoroughly regulating the conditions of pari-mutuel betting on horse races gave no indication that it intended to permit widespread, potentially irresponsible and wholly unregulated transactions of betting outside race tracks under the guise of an agency to perform acts thereby made lawful within a race track. The contrary intent is the only one fairly deducible from the scheme of the statute and from the language employed."

And see *State v. Cross,* 22 Wash. (2d) 402, 156 P. (2d) 416, 421.

There are additional reasons supporting our construction of the statute, to which attention will now be called.

▆▆ The Racing Commission is authorized "to prepare and promulgate a complete set of rules and regulations to govern the race meets in this state." Interpretive regulations by a commission charged with the enforcement of an act will carry great weight in determining the operation of a statute, as our recent decision in *Sprague v. Fisher,* 184 Or. 1, 197 P. (2d) 662, illustrates. See 2 Sutherland, op. cit. 516, § 5105. The following rules of the commission taken from "Rules of Horse Racing", revised 1947, indicate interpretation of the statute by the commission in harmony with the views here expressed:

"11. Associations licensed by this Commission shall permit only the Pari-Mutuel system of wagering within their inclosures, and only the installation and use of mechanical or other equipment as may from time to time be approved by the Commission."

"350. No Association giving a race meeting under a license issued by the Oregon Racing Commission shall permit wagers to be made on the grounds of said Association on any race run outside said grounds, and no foreign or gambling device of any kind shall be permitted on said grounds."

"352. The acceptance by an Association of so-called 'come-back money' or other wagers placed outside the inclosure of said Association is strictly prohibited. No Association shall aid or abet the acceptance of such wagers or make any special provision within or without the inclosure for the acceptance of such wagers or for the encouragement of such method of wagering. An Association shall not set up or permit the establishment of any

agency within the inclosure for the receipt of wagers made outside the inclosure.''

■ A proper interpretation of the first clause of § 91-910 leads to the conclusion that the Racing Act itself makes bookmaking unlawful. That clause may be read in either of two ways. It may mean that bookmaking and poolselling and the circulation of handbooks and wagering on licensed race meets are each of them unlawful unless by the pari mutuel method, or it may have been intended that the phrase ''other than by the mutuel method'' refers only to the phrase immediately preceding it, ''or to bet or wager on any licensed race-meet''. In the latter view the only thing permitted is wagering by the pari mutuel method, while the activities first enumerated are prohibited. In the title we find these recitals: ''Providing for mutual wagering; prohibiting pool selling, bookmaking, and circulation of handbooks''. The title may not be used to contradict clear provisions in the body of the act; but it is well settled that, where it is necessary to construe ambiguous language, the title of the act, being a part of the statute, can be looked to for the purpose of ascertaining its meaning. *State ex rel Bylander v. Hoss,* 143 Or. 383, 386, 22 P. (2d) 883, and cases there cited. See, also, 50 Am. Jur., Statutes, 299, § 311; 2 Sutherland, op. cit. 343, § 4802. It is impossible to read the first clause of § 91-910 with the recitals in the title which we have quoted without concluding that the legislature has placed an absolute ban on bookmaking, pool selling and the circulation of handbooks. If it should be argued—as well it might—that this prohibition was only intended to apply at the race track, then the defendant's case stands confessed, because, if there is a limitation as to place in the section, that limitation of necessity applies to wagering as well as to bookmaking.

The construction which we have indicated should be given this clause is supported by the rules of the commission, which by Rule 354 has provided: "No Association shall permit the making of handbooks on its grounds * * *" and by Rule 374a: "The Oregon Racing Commission, in addition to any other valid grounds or reasons, may refuse to issue a license to any person: 1. Who owns, operates, or has an interest in any bookmaking, pool selling or any illegal enterprise." It is evident from the foregoing rules that the commission considered that the statute made a distinction between its licensees conducting pari mutuel wagering at a licensed race meet, on the one hand, and bookmakers, pool sellers and circulators of handbooks on the other. The former are not bookmakers or pool sellers within the meaning of the statute; the latter's activities are condemned, no matter by what method they are pursued.

■ The position of the defendant involves a disregard of the fundamental rule that repeals by implication are not favored. *Ulrich v. Lincoln Realty Co.,* 180 Or. 380, 403, 168 P. (2d) 582, 175 P. (2d) 149, and cases there cited. "There must be a positive repugnance between the provisions of the new law and those of the old, and even then the old law is repealed by implication only to the extent of the repugnance." *Cabell v. City of Portland,* 153 Or. 528, 543, 57 P. (2d) 1292. Mr. Bishop states the matter thus in his work on Statutory Crimes:

"As already seen, statutes in derogation of the common law, or of a prior statute, are construed strictly, not operating beyond their words or the clear repugnance of their provisions; that is, the new displaces the old only as directly and irreconcilably opposed in terms. For when the legislative power professes to add to the law, as it does in

the enactment of an affirmative statute, we cannot assume for it an intention also to subtract from it, while there is any admissible rule of interpretation which, applied to the old, to the new, or to both, will enable all to stand.'' Bishop on Statutory Crimes (3d ed.) 163, § 155.

Concededly the Racing Act, with its legislative approval of the pari mutuel system of betting, is to an extent inconsistent with the Nuisance Statute, but to hold that the repugnance is more than a mere exception to that statute, taking out from its operation regulated wagering at the race track, would be to give the provisions of the Racing Act a broad construction in favor of implied repeal in violation of the principles just stated. And so it is that in all the decisions which have come to our attention upon statutes similar to ours the courts have uniformly held that their anti-gambling laws stood unimpaired, subject only to the specific exception, narrowly construed, of the racing acts, and have turned back every attempt to use those acts as the means of opening the way for commercial gambling. See *Ex parte Goddard,* 24 Cal. App. (2d) 132, 74 P. (2d) 818; *Ex parte Walker,* 11 Cal. (2d) 464, 80 P. (2d) 990, 117 A. L. R. 825; *People v. Sullivan,* 60 Cal. App. (2d) 539, 141 P. (2d) 230; *State v. Cross,* supra; *Lagoon Jockey Club v. Davis County,* 72 Utah 405, 270 P. 543; *Pari-Mutuel Messenger Service, Inc. v. Department of State,* supra.

It is true that in California and in most of the other states the racing acts contain language expressly confining the operation of the pari mutuel system to the race track enclosure. But in the Washington statute there is no such provision. Laws of 1933, Ch. 55, p. 290; Rem. Rev. Stat. Supp., § 8312. The Washington

Act and our own bear intrinsic evidence either that one served as a model for the other or that the same persons had a hand in the drafting of both. The measures were before the legislatures of the respective states at approximately the same time, the Washington Act being approved by the governor of that state on March 3, 1933, and the Oregon Act by the governor of this state on March 14, 1933. The titles and many of the provisions of the two acts are in practically identical language. In § 7 of the Washington Act, as it appears in Laws of 1933, Ch. 55, is the following provision: "It shall be unlawful to conduct pool selling, bookmaking, or to circulate hand books, or to bet or wager on any horse race other than by the pari-mutuel method". This language is in substance the same as the first clause of § 91-910, O. C. L. A., and, as stated, there is no express provision in the Washington Act confining pari mutuel wagering to the enclosure of the race track. In this situation the construction placed upon the Washington statute by the Washington courts should have very great weight with us. In *State v. Cross*, supra, the defendant was charged with receiving money intended to be bet on a horse race and recording a bet designed to be bet on the result of a horse race— in short, bookmaking. The offense was a violation of the anti-gambling statute of the state passed in 1909. Overruling contentions on behalf of the defendant, in substance the same as those put forward here, the Supreme Court of Washington affirmed a judgment of conviction. The views of the court are summarized in the concluding portion of the opinion from which we quote:

"It is quite true that our pari-mutuel betting act is somewhat different from the act passed by the California legislature. However, it is entirely

clear that in both instances, in California and Washington, the legislatures intended that in passing acts to control pari-mutuel betting, they did not propose to change in any way the general laws relating to gambling.

"An analysis of the statutes under consideration brings to light the fact that the act of 1909 is general in its scope, while that of 1933 is special in that it only attempts to regulate pari-mutuel betting at the race tracks and has no relation to acts committed in other places.

"It is apparent that the legislature, in passing the latter act, intended to make an exception from the general gambling act and allow pari-mutuel betting and in so doing did not intend to cover the entire field of betting and recording bets upon horse racing. This being true, it is evident that the special statute did not repeal the general statute. The policy in this state toward commercial gambling is clear and unequivocal. A reference to our statutes on that subject brings to light that commercial gambling in all of its phases has been uniformly condemned by our legislature. There is nothing in the act authorizing pari-mutuel betting which indicates in the slightest degree an intention to depart from the public policy of this state which condemns and prohibits commercial gambling.

"It is quite clear that if the legislature had intended to depart from its long established policy, that intent would have been indicated in the pari-mutuel act. That act, however, when read in its entirety shows a specific intention to retain the general prohibition.

"We hold that the act allowing pari-mutuel betting upon horse racing did not repeal or change the general act relating to gambling and that the former act continued in full force and effect."

■ It is our holding, based upon an analysis of the Oregon Racing Act, the applicable principles of statutory construction, and the pertinent decisions, that the

only effect of that Act, so far as the present question is concerned, was to except regulated pari mutuel wagering at a licensed race track from the operation of the Oregon Nuisance Statute, leaving that statute otherwise in full force and effect. The City of Portland, therefore, was free to pass an ordinance making it unlawful to conduct a bookmaking establishment or to sell pools upon animal races, excepting therefrom pari mutuel betting at the race track or at race meets conducted under the supervision of the Oregon Racing Commission. The ordinance does not conflict with the state law or state policy and is valid. The Circuit Court erred in sustaining the demurrer to the complaint. The judgment of dismissal is, therefore, reversed, and the cause remanded for further proceedings conformable to this opinion.